WALDES et al. v. INTERNATIONAL MFRS.' AGENCY, Inc.

(District Court, S. D. New York. December 8, 1916.)

1. TRADE-MARKS AND TRADE-NAMES ⬤➔93(3)—SUFFICIENCY OF EVIDENCE— PRIOR USER OF TRADE-MARK.

In suit to restrain infringement of a trade-mark, evidence *held* sufficient to establish plaintiff's user of the trade-mark prior to defendant's use of a similar mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 106; Dec. Dig. ⬤➔93(3).]

2. TRADE-MARKS AND TRADE-NAMES ⬤➔21—RIGHT TO TRADE-MARK—USER.

A user of a trade-mark prior to defendant's user on about one-eleventh of the whole of plaintiff's output, which is uninterrupted and open, is not a casual or sporadic user, but is sufficient to establish right to the trade-mark.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 24; Dec. Dig. ⬤➔21.]

3. TRADE-MARKS AND TRADE-NAMES ⬤➔21—RIGHT TO TRADE-MARK—PRIORITY OF USER.

Ownership of a trade-mark depends solely on priority of user, though that use prior to defendant's use is small and for only a few months,

so that at the time defendant came into the market the mark had not become identified largely in the hands of the public with the goods of plaintiff.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 24; Dec. Dig. ☞21.]

4. TRADE-MARKS AND TRADE-NAMES ☞21—RIGHT TO TRADE-MARK—USER—PORTION OF MARK.

The use of the upper half of the Western hemisphere of the globe is a user of a trade-mark consisting of the entire Western hemisphere; it being immaterial how much of it is used, so long as enough appears to show that the globe was meant.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 24; Dec. Dig. ☞21.]

5. TRADE-MARKS AND TRADE-NAMES ☞45—OWNERSHIP OF TRADE-MARK—EFFECT OF REGISTRATION.

Registration confers no right to a trade-mark, and limits none, but is a mere procedural advantage, depending on common-law ownership.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. §§ 53, 59; Dec. Dig. ☞45.]

6. TRADE-MARKS AND TRADE-NAMES ☞32—USE OF TRADE-MARK—INCONSPICUOUS MARK.

The use of a trade-mark, which is so small and of such a color as to be difficult to discover, is evidence against the abandonment of the trade-mark, though not effective to establish the mark itself.

[Ed. Note.—For other cases, see Trade-Marks and Trade-Names, Cent. Dig. § 36; Dec. Dig. ☞32.]

In Equity.. Suit for injunction by Heinrich Waldes and others, copartners doing business under the firm name and style of Waldes & Co., against the International Manufacturers' Agency, Incorporated. Decree rendered for plaintiffs.

This is the usual suit for an injunction and accounting under Trade-Mark Registration Act, Feb. 20, 1905, c. 592, 33 Stat. 724. The bill also asks for cancellation of the defendant's mark in so far as it conflicts with its own. The plaintiffs are aliens doing business in Austria, and the defendant is a corporation, a citizen of New York. On November 1, 1910, the plaintiffs obtained a registered trade-mark for snap buttons used as garment fasteners, which consisted of a plane representation of the Western hemisphere, with parallels and meridian. They asserted that this had been used in their Austrian business since July, 1905, and had been registered in Austria.

The defendant was incorporated early in September, 1912, but began to do business some time before—just when it is not certain. They adopted for their trade-mark a globe having a plane representation of the Atlantic Ocean, with the continents on either side, at the top of which was an airship, at the center a steamer, and at the bottom a train of cars. On October 19, 1915, they obtained a trade-mark for this to be used on dress shields, snap fasteners, corset laces, celluloid thimbles, finger shields, and collar supports. Above the globe was the word, "Eymay." The business of the defendant is the sale of the articles mentioned in the registration and of notions generally.

Snap fasteners are sold in two ways: By the dozen on cards; and fastened into a tape, which is reeled. The plaintiffs have used a great many different kinds of cards in this country, but by far the largest is a card going by the name of "Koh-i-noor" in dark blue. An insignificant detail of this card printed in gold is the globe, which is the registered trade-mark. It is so printed, however, that the ordinary observer would hardly be able to pick it out without much attention, for the color of the gold is very little distinguished from the dark blue, and there are many other confusing features. The tape fasteners sold by the plaintiff are on a reel, which does not contain the trade-

mark at all. Defendant sells its fasteners on a card, on which it does not use any representation of a globe; but it also sells tape fasteners, both on a reel and in a yellow box. On the front of the yellow box it uses its trade-mark of the globe without the word "Eymay," and it puts a paper band around the reel containing its full trade-mark. It is these two uses of which the plaintiff complains.

On the trial the evidence was excluded of the use of the plaintiff's trade-mark in Europe, it appearing that over the whole continent of Europe the globe had been widely used, and the court confined the plaintiff to its use in the United States. The plaintiffs then showed that the "Koh-i-noor" mark had been used in enormous quantities since the year 1909, over 20,000,000 in all having been sold, although the business had fallen off greatly since the beginning of the Great War. They also showed that a card called the "Rival" had been sold in large quantities, 1,800,000 in all, since the year 1909. This card had the upper half of the plaintiffs' trade-mark at the top of the card. It then showed some 13 other cards, which had been used in small quantities, being shipped over to this country in nothing like the amount of the "Koh-i-noor," or even the "Rival." The user of these cards is as follows:

| Name of Card. | Number of Cards Sold. | When Sold. |
|---|---|---|
| Koh-i-noor | 8,536 | From March 13, 1914, to June 16, 1916. |
| " (No. 9) | 3,600 | " April 27, 1914, to March 26, 1915. |
| Best Quality | 7,902 | " August 8, 1912, to April 21, 1913. |
| Corso (white card) | 7,560 | " July 19, 1913, to July 17, 1914. |
| Corso (green card) | 15,684 | " May 3, 1915, to October 6, 1915. |
| Queen | 19,056 | " March 28, 1912, to June 6, 1913. |
| Zeppelin | 3,572 | " March 15, 1912, to May 15, 1913. |
| London | 960 | " April 15, 1915. |
| Conqueror | 45,300 | " April 7, 1915, to August 3, 1915. |
| Noblem | 11,928 | " April 12, 1915, to April 13, 1915. |
| Record | 488 | " August 27, 1914. |
| Mignon | 45,856 | " July 13, 1915, to October 6, 1915. |
| Atlas | 40,555 | " April 14, 1915, to October 6, 1915. |

It also showed large and continuous advertising since 1909, in which the globe played a conspicuous part. In October, 1913, the plaintiffs objected to the use of the defendant's mark upon snap fasteners, but the defendant refused to accede to their claim.

Harry D. Nims, of New York City, for plaintiffs.
Louis S. Posner, of New York City, for defendant.

LEARNED HAND, District Judge (after stating the facts as above).
[1] I think that there is enough proof in the case of a user antedating the defendant's user to support the plaintiffs' claim of a trade-mark, without considering the "Koh-i-noor" user, or the question of law raised by the foreign user with local registration. The earliest use, besides the "Rival" card and the "Koh-i-noor," is that of the "Zeppelin" card, which began on March 15, 1912, consisted of 7 separate invoices, and amounted in all to 2,136 cards before September 1, 1912. The next use was of the "Queen" card, beginning March 28, 1912, and amounting to 14,168 before September 1, 1912, in 32 separate invoices. Finally there is the "Best Quality" use, beginning on August 8, 1912, and consisting of 4 separate invoices, amounting to 720 cards before September 1, 1912. The defendant's use cannot with certainty be dated before September 1, 1912, but possibly it may have run back to June 1, 1912. In the latter event we should have 3 invoices of "Zeppelin," aggregating 1,048 cards, and 13 invoices of "Queen," aggregating 4,164 cards, antedating it. The use thus begun in March

15, 1912, continued without any break up to June of this year in the sales of "Koh-i-noor" (Exhibit A.) Various forms were used, aggregating the very substantial total of 211,597, and in every case the trademark was a substantial feature of the card, striking in its position and distinctiveness against the background. But the effective user does not stop there, because of the "Rival" card (Exhibit 3) 1,800,000 have been sold from 1909 to the present time. This card shows in the most conspicuous way the upper half of the hemisphere, and so far as that one-half can constitute a user it is such. That question I shall consider later, assuming for the present that it is to be included.

[2] Thus we have a total user of about one-eleventh of the whole output of the plaintiffs', antedating the defendant's user, uninterrupted and open. It is idle to speak of such a user as casual or sporadic, in the sense that it is used in such cases as Menendez v. Holt, 128 U. S. 514, 9 Sup. Ct. 143, 32 L. Ed. 526, Brower v. Boulton, 58 Fed. 888, 7 C. C. A. 567, or Kohler Mfg. Co. v. Beeshore, 59 Fed. 575, 8 C. C. A. 215, where the name was used, off and on, for a single shipment, or for a short period, and then abandoned. This had been a foreign mark of the plaintiffs', and they had always intended to use it on all their goods. Indeed, the only possible ground on which the defendant can stand is that the plaintiffs failed unintentionally in the "Koh-i-noor" card, because the globe is too small and its gold color is not a sufficiently distinctive feature. The intention to use their mark on that card is apparent enough, and the only exception throughout the case is the instance of "Revol" (Exhibit 12) and the "Revol" tape (Exhibit B).

[3] If we were to disregard the "Rival" card, it is true that the use would be small, and would antedate the defendants by only a few months. In considering that question I shall not determine whether a mere claim of trade-mark by an alien, who has used it abroad, when the mark is fanciful and arbitrary, is enough to reserve the field for a while and keep others off. I shall, on the contrary, assume that the "ownership" of the mark depends solely upon user. Yet it is the priority of user alone that controls, even though, when the defendant comes into the field, it may not be fully established, or may not even be enough established to have become associated largely in the public mind with the plaintiff's make. Kathreiner's Malzkaffee Fab. v. Pastor Kneipp Medical Co., 82 Fed. 321, 27 C. C. A. 351; Thomas Carroll & Son Co. v. McIlvaine & Baldwin, 183 Fed. 22, 105 C. C. A. 314; Baker v. Delapenha (C. C.) 160 Fed. 746. Were it not so, it would be of extreme difficulty to show at just what point in time the mark became associated with the maker in enough of his customers' minds to justify the inference that the defendant's use might have become confusing. Therefore, once his use begins, the rest of the public must avoid his fanciful mark.

[4] Hence the user here would be enough, even though the "Rival" cards were disregarded, because we have an earlier use of the mark, continuous and substantial, to which no objection can possibly be taken. I do not, however, believe that the "Rival" cards should be thrown out of consideration. That question turns upon whether the use of half a hemisphere is enough like the use of the plane globe to identify the

goods as belonging to the same maker. I cannot see why not. In several of the other cards the base of the globe is more or less cut off, but no one would question that enough is left clearly to indicate that the globe is portrayed. I cannot see what difference it makes how much of the globe is shown, so long as there be enough to put it beyond doubt that a globe is meant. Sometimes people like to represent the globe as floating amid clouds, which conceal a substantial part of the hemisphere. It would, I think, be absurd to say that such a user was not the user of the globe itself. There is certainly no rule of rigidly undeviating similarity in the user of the mark. Such notions lose sight of the whole underlying theory of the matter, which, it cannot be too often repeated, is that the mark is only a representation, and will represent as far as it is recognized as identical with what has become familiar.

[5] People sometimes talk as though registration put some rigid limitation on user, but I know of none such. Registration confers no right, and limits none; it is a mere procedural advantage, depending upon common-law "ownership," which can exist quite as well without it. In a case like this, where the jurisdiction of the court does not depend upon it, it gives scarcely any advantage of any sort, except under section 16. It is not, like the issuance of a patent, the condition and the limitation of the owner's rights.

Now no one can doubt that the half hemisphere on the "Rival" card, being so distinctive as it is, indicates the globe, and only that, and no one can doubt that, to minds accustomed to an association of a half hemisphere with these fasteners, the full representation of a globe would carry out that association. If, indeed, the only use of the mark had been a half hemisphere, I should not hesitate to hold it infringement to use the whole. For the same reason I do not hesitate to include within the actual user of the mark such a user as the "Rival" card presents.

[6] As to the "Koh-i-noor" card itself, I am of the same opinion as Judge Hough was on the preliminary injunction; i. e., that it occupies too insignificant a place in the total make-up to serve as a trade-mark. No one could have been present at the trial and failed to be impressed with the genuine difficulty of the witness Arnold in picking out that feature. But this "Koh-i-noor" card is effective evidence against abandonment, for it shows an honest intent to use the mark, though it be not effective to establish the mark itself.

An injunction will go against the use of the globe on all packages, or reels, containing snap fasteners, and the motion will be granted to cancel the defendant's registration as applied to such goods. The decree will include damages and costs.