**BLUE BELL, INC., Plaintiff-Appellant,**

v.

**FARAH MANUFACTURING COMPANY, INC., Defendant-Appellee.**

No. 74–1131.

United States Court of Appeals, Fifth Circuit.

Feb. 27, 1975.
Rehearing Denied April 4, 1975.

John B. Luscombe, Jr., El Paso, Tex., Alfred P. O'Hara, Marie V. Driscoll, New York City, for plaintiff-appellant.

J. Malcolm Harris, El Paso, Tex., William C. Conner, Henry W. Koster, New York City, for defendant-appellee.

Before GEWIN, AINSWORTH and GEE, Circuit Judges.

GEWIN, Circuit Judge:

In the spring and summer of 1973 two prominent manufacturers of men's clothing created identical trademarks for goods substantially identical in appearance. Though the record offers no indication of bad faith in the design and adoption of the labels, both Farah Manufacturing Company (Farah) and Blue Bell, Inc. (Blue Bell) devised the mark "Time Out" for new lines of men's slacks and shirts. Both parties market their goods on a national scale, so they agree that joint utilization of the same trademark would confuse the buying public. Thus, the only question presented for our review is which party established prior use of the mark in trade. A response to that seemingly innocuous inquiry, however, requires us to define the chameleonic term "use" as it has developed in trademark law.[1]

After a full development of the facts in the district court both parties moved for summary judgment. The motion of Farah was granted and that of Blue Bell denied. It is not claimed that summary judgment procedure was inappropriate; the controversy presented relates to the application of the proper legal principles to undisputed facts. A permanent injunction was granted in favor of Farah but no damages were awarded, and Blue Bell was allowed to fill all orders for garments bearing the Time Out label received by it as of the close of business on December 5, 1973. For the reasons hereinafter stated we affirm.

Farah conceived of the Time Out mark on May 16, after screening several possible titles for its new stretch menswear. Two days later the firm adopted an hourglass logo and authorized an extensive advertising campaign bearing the new insignia. Farah presented its fall line of clothing, including Time Out slacks, to sales personnel on June 5. In the meantime, patent counsel had given clearance for use of the mark after scrutiny of current federal registrations then on file. One of Farah's top executives demonstrated samples of the Time Out

---

1. *Compare* Western Stove Co. v. George D. Roper Corp., 82 F.Supp. 206 (S.D.Cal.1949) (first commercial sale controls, despite opposing party's prior conception and advertisement of the mark) *with* Charles Pfizer & Co. v. R. J. Moran Co., 125 U.S.P.Q. 201 (1960) (prior commercial sale is not determinative; drug manufacturer who first conceived of the mark and appended it to drugs for experimental purposes has rights superior to drug producer who initially placed goods on the market).

garments to large customers in Washington, D. C. and New York, though labels were not attached to the slacks at that time. Tags containing the new design were completed June 27. With favorable evaluations of marketing potential from all sides, Farah sent one pair of slacks bearing the Time Out mark to each of its twelve regional sales managers on July 3. Sales personnel paid for the pants, and the garments became their property in case of loss.

Following the July 3 shipment, regional managers showed the goods to customers the following week. Farah received several orders and production began. Further shipments of sample garments were mailed to the rest of the sales force on July 11 and 14. Merchandising efforts were fully operative by the end of the month. The first shipments to customers, however, occurred in September.

Blue Bell, on the other hand, was concerned with creating an entire new division of men's clothing, as an avenue to reaching the "upstairs" market. Though initially to be housed at the Hicks-Ponder plant in El Paso, the new division would eventually enjoy separate headquarters. On June 18 Blue Bell management arrived at the name Time Out to identify both its new division and its new line of men's sportswear. Like Farah, it received clearance for use of the mark from counsel. Like Farah, it inaugurated an advertising campaign. Unlike Farah, however, Blue Bell did not ship a dozen marked articles of the new line to its sales personnel. Instead, Blue Bell authorized the manufacture of several hundred labels bearing the words Time Out and its logo shaped like a referee's hands forming a T. When the labels were completed on June 29, the head of the embryonic division flew them to El Paso. He instructed shipping personnel to affix the new Time Out labels to slacks that already bore the "Mr. Hicks" trademark. The new tags, of varying sizes and colors, were randomly attached to the left hip pocket button of slacks and the left hip pocket of jeans. Thus, although no change occurred in the design or manufacture of the pants, on July 5 several hundred pair left El Paso with two tags.

Blue Bell made intermittent shipments of the doubly-labeled slacks thereafter, though the out-of-state customers who received the goods had ordered clothing of the Mr. Hicks variety. Production of the new Time Out merchandise began in the latter part of August, and Blue Bell held a sales meeting to present its fall designs from September 4–6. Sales personnel solicited numerous orders, though shipments of the garments were not scheduled until October.

By the end of October Farah had received orders for 204,403 items of Time Out sportswear, representing a retail sales value of over $2,750,000. Blue Bell had received orders for 154,200 garments valued at over $900,000.[2] Both parties had commenced extensive advertising campaigns for their respective Time Out sportswear.

Soon after discovering the similarity of their marks, Blue Bell sued Farah for common law trademark infringement and unfair competition, seeking to enjoin use of the Time Out trademark on men's clothing. Farah counter-claimed for similar injunctive relief. The district court found that Farah's July 3 shipment and sale constituted a valid use in trade, while Blue Bell's July 5 shipment was a mere "token" use insufficient at law to create trademark rights.[3] While we af-

2. The documents do not disclose whether this valuation represents the retail or wholesale price.

3. Specifically, the district court made the following factual determinations:

c. On July 3, 1973, Defendant, Farah Manufacturing Company, Inc., made interstate shipment of men's slacks bearing "TIME OUT" labels, and the shipment on such date was a good faith step in a continuous and uninterrupted program of marketing of "TIME OUT" slacks. The shipment of July 3, 1973, was to Farah's regional sales managers also employed by Farah Sales Corporation, a wholly owned subsidiary of Farah Manufacturing Company, Inc. The garments shipped were sold to and paid for by the regional sales managers. The shipment

firm the result reached by the trial court as to Farah's priority of use, the legal grounds upon which we base our decision are somewhat different from those undergirding the district court's judgment.

Federal jurisdiction is predicated upon diversity of citizenship, since neither party has registered the mark pursuant to the Lanham Act.[4] Given the operative facts surrounding manufacture and shipment from El Paso, the parties agree the Texas law of trademarks controls. In 1967 the state legislature enacted a Trademark Statute.[5] Section 16.02 of the Act explains that a mark is "used" when it is affixed to the goods and "the goods are sold, displayed for sale, or otherwise publicly distributed." Thus the question whether Blue Bell or Farah established priority of trademark use depends upon interpreta-

tion of the cited provision. Unfortunately, there are no Texas cases construing § 16.02. This court must therefore determine what principles the highest state court would utilize in deciding such a question. In view of the statute's stated purpose to preserve common law rights,[6] we conclude the Texas Supreme Court would apply the statutory provision in light of general principles of trademark law.

A trademark is a symbol (word, name, device or combination thereof) adopted and used by a merchant to identify his goods and distinguish them from articles produced by others. Lanham Act § 45, 15 U.S.C. § 1127; Clairol, Inc. v. Gillette Co., 270 F.Supp. 371 (E.D.N.Y. 1967); see Vernon's Tex.Code Ann., Bus. & Comm. § 16.01(5) (1968). Ownership of a mark requires a combination of both

was made to enable sales personnel to exhibit the labeled garments to customers to solicit orders. The garments shipped were exhibited to customers and orders were solicited and obtained therefor. As a result of such shipment and marketing program, orders for Farah's TIME OUT slacks were received in substantial volume such that prior to submission hereof, Farah had received orders from retail stores for some 204,403 units of TIME OUT garments, representing retail sales value of some $2,751,-935.00.

d. The Plaintiff, Blue Bell, Inc., sought to establish a new TIME OUT division within the company and to this end incorporated a new corporation under the name TIME OUT, INC. At the time of Plaintiff's claimed first use of the trademark on July 5, 1973, the new corporation had not been formed and there was no established business in the new division nor did Plaintiff have any established line of garments known or identified as TIME OUT garments. In an effort to reserve the trademark "TIME OUT" for a contemplated new line of garments and/or for a contemplated new division within the company, Plaintiff randomly tagged and shipped with a supplemental "TIME OUT" label, garments manufactured by its HICKS-PONDER division, which garments had been ordered, shipped and sold bearing the "MR. HICKS" trademark.

The trial court reached the following conclusions of law:

4. Defendant Farah's shipment of TIME OUT labeled garments in interstate commerce on July 3, 1973, was a good faith step in a continuous and uninterrupted pro-

gram of placing labeled goods on the market and soliciting orders therefor, and constituted a valid first use of the trademark. Such actions on the part of the Defendant Farah constituted use of the mark within the meaning of Art. 16.02, Business and Commerce Code of the State of Texas, in that TIME OUT labels were placed on tags or labels affixed to the goods and the goods were sold, displayed for sale, and otherwise publicly distributed in the state. Such use preceded any use of the trademark by Plaintiff Blue Bell.

5. Plaintiff Blue Bell's shipment of "MR. HICKS" garments carrying a supplemental "TIME OUT" label on July 5, 1973, was an attempt to reserve the trademark for a line of garments or line of business not yet established or existing. Such shipment was a token use insufficient in law to give Plaintiff prior rights to the trademark. Moreover, Plaintiff's claimed first use on such date came after Defendant's first use of the trademark.

4. 15 U.S.C. §§ 1051–1127. Federal courts have original jurisdiction over actions arising under the Lanham Act. 15 U.S.C. § 1121. In the absence of federal registration, however, state law controls infringement and unfair competition claims. El Chico, Inc. v. El Chico Cafe, 214 F.2d 721 (5th Cir. 1954).

5. Vernon's Tex.Code Ann., Bus. & Comm. §§ 16.01–16.28 (1968).

6. Vernon's Tex.Code Ann., Bus. & Comm. § 16.27 (1968); see also Arnold, Proposed New Texas Trademark Statute, 4 S.Tex.L.J. 1, 7 (1958).

appropriation and use in trade, United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918). Thus, neither conception of the mark, Rolley, Inc. v. Younghusband, 204 F.2d 209 (9th Cir. 1953); Modular Cinemas of America, Inc. v. Mini Cinemas Corp., 348 F.Supp. 578 (S.D.N.Y.1972), nor advertising alone establishes trademark rights at common law.[7] Minnesota Mining and Manufacturing Co. v. Minnesota Linseed Oil Paint, Inc., 229 F.2d 448, 43 CCPA 746 (1956); Consumers Petroleum Co. v. Consumers Co. of Illinois, 169 F.2d 153 (7th Cir.), cert. denied, 335 U.S. 902, 69 S.Ct. 406, 93 L.Ed. 437 (1949); Gray v. Armand Co., 58 App.D.C. 50, 24 F.2d 878 (1928). Rather, ownership of a trademark accrues when goods bearing the mark are placed on the market. Wallace & Co. v. Repetti, 266 F. 307 (2d Cir.), cert. denied, 254 U.S. 639, 41 S.Ct. 13, 65 L.Ed. 451 (1920).

■■ The exclusive right to a trademark belongs to one who first uses it in connection with specified goods. McClean v. Fleming, 96 U.S. 245, 24 L.Ed. 828 (1877); 3 R. Callman, Unfair Competition, Trademarks and Monopolies § 76.-2(c) (3d ed. 1969). Such use need not have gained wide public recognition, Kathreiner's Malzkaffee Fabriken v. Pastor Kneipp Medicine Co., 82 F. 321 (7th Cir. 1897); Waldes v. International Manufacturers' Agency, 237 F. 502 (S.D.N.Y. 1916), and even a single use in trade may sustain trademark rights if followed by continuous commercial utilization. Ritz Cycle Car Co.. v. Driggs-Seabury Ordnance Corp., 237 F. 125 (S.D.N.Y.1916).

The initial question presented for review is whether Farah's sale and shipment of slacks to twelve regional managers constitutes a valid first use of the Time Out mark. Blue Bell claims the July 3 sale was merely an internal transaction insufficiently public to secure trademark ownership. After consideration of pertinent authorities, we agree.

■■ Secret, undisclosed internal shipments are generally inadequate to

support the denomination "use." Trademark claims based upon shipments from a producer's plant to its sales office, and vice versa, have often been disallowed. Sterling Drug, Inc. v. Knoll Chemische Fabriken, 159 U.S.P.Q. 628 (TTAB 1968); Black Panther Co., Inc. v. Godfrey L. Cabot, Inc., 121 U.S.P.Q. 533 (TTAB 1949); L & C Hardtmuth, Inc. v. Koh-I-Noor Pencil Factory, 101 U.S.P.Q. 492 (Comm'r 1954); Proctor and Gamble Co. v. Jacqueline Cochran, Inc., 102 U.S.P.Q. 492 (Comm'r 1954); Dickerson v. Wyandotte Chemical Corp., 91 U.S.P.Q. 345 (Comm'r 1951). Though none of the cited cases dealt with *sales* to intra-corporate personnel, we perceive that fact to be a distinction without a difference. The sales were not made to customers, but served as an accounting device to charge the salesmen with their cost in case of loss. The fact that some sales managers actively solicited accounts bolsters the good faith of Farah's intended use, but does not meet our essential objection: that the "sales" were not made to the public.

The primary, perhaps singular purpose of a trademark is to provide a means for the consumer to separate or distinguish one manufacturer's goods from those of another. Personnel within a corporation can identify an item by style number or other unique code. A trademark aids the public in selecting particular goods. As stated by the First Circuit:

> But to hold that a sale or sales are the *sine qua non* of a use sufficient to amount to an appropriation would be to read an unwarranted limitation into the statute, for so construed registration would have to be denied to any manufacturer who adopted a mark to distinguish or identify his product, and perhaps applied it thereon for years, if he should in practice lease his goods rather than sell them, as many manufacturers of machinery do. It seems to us that although evidence of sales is highly persuasive, the question of use adequate to establish appropriation re-

---

7. We intimate no view as to whether the Texas statute's definition of use embracing "display for sale" would change the common

law rule. Vernon's Tex.Code Ann., Bus. & Comm. § 16.02 (1968).

mains one to be decided on the facts of each case, and that evidence showing, first, adoption, and, second, *use in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark,* is competent to establish ownership

. . . .

New England Duplicating Co. v. Mendes, 190 F.2d 415, 418 (1st Cir. 1951) (Emphasis added). Similarly, the Trademark Trial and Appeal Board has reasoned:

> To acquire trademark rights there has to be an "open" use, that is to say, a use has to be made to the relevant class of purchasers or prospective purchasers since a trademark is intended to identify goods and distinguish those goods from those manufactured or sold by others. There was no such "open" use rather the use can be said to be an "internal" use, which cannot give rise to trademark rights.

Sterling Drug, Inc. v. Knoll A. G. Chemische Fabriken, *supra* at 631.

Farah nonetheless contends that a recent decision of the Board so undermines all prior cases relating to internal use that they should be ignored. In *Standard Pressed Steel Co. v. Midwest Chrome Process Co.,* 183 U.S.P.Q. 758 (TTAB 1974) the agency held that internal shipment of marked goods from a producer's manufacturing plant to its sales office constitutes a valid "use in commerce" for registration purposes.

▆▆ An axiom of trademark law has been that the right to register a mark is conditioned upon its actual use in trade. Rolley, Inc. v. Younghusband, 204 F.2d 209 (9th Cir. 1953); Waldes v. International Manufacturers' Agency, 237 F. 502 (S.D.N.Y.1916); Dickerson v. Wyandotte Chemical Corp., 91 U.S.P.Q. 345 (Comm'r 1951); 3 R. Callman, Unfair Competition, Trademarks, and Monopolies § 76.2(K) (3d ed. 1969). Theoretically, then, common law use in trade should precede the use in commerce upon which Lanham Act registration is predicated. Arguably, since only a trademark owner can apply for registration, any activity adequate to create registrable rights must perforce also create trademark rights. A close examination of the Board's decision, however, dispels so mechanical a view. The tribunal took meticulous care to point out that its conclusion related solely to registration use rather than ownership use.

It has been recognized and especially so in the last few years that, in view of the expenditures involved in introducing a new product on the market generally and the attendant risk involved therein prior to the screening process involved in resorting to the federal registration system and in the absence of an "intent to use" statute, a token sale or a single shipment in commerce *may be sufficient to support an application to register a trademark* in the Patent Office notwithstanding that the evidence may not show what disposition was made of the product so shipped. That is, the fact that a sale or a shipment of goods bearing a trademark was *designed primarily to lay a foundation for the filing of an application for registration* does not, per se, invalidate any such application or subsequent registration issued thereon.

\* \* \* \* \* \*

Inasmuch as it is our belief that a most liberal policy should be followed in a situation of this kind [*in which dispute as to priority of use and ownership of a mark is not involved*], applicant's initial shipment of fasteners, although an intra-company transaction in that it was to a company sales representative, was a bona fide shipment.

. . .

Standard Pressed Steel Co. v. Midwest Chrome Process Co., *supra* at 764–65 (Emphasis added).

Priority of use and ownership of the Time Out mark are the only issues before this court. The language fashioned by the Board clearly indicates a desire to leave the common law of trademark ownership intact. The decision may demonstrate a reversal of the presumption that ownership rights precede registration rights, but it does not affect our

analysis of common law use in trade. Farah had undertaken substantial preliminary steps toward marketing the Time Out garments, but it did not establish ownership of the mark by means of the July 3 shipment to its sales managers. The gist of trademark rights is actual use in trade. Modular Cinemas of America, Inc. v. Mini Cinemas Corp., 348 F.Supp. 578 (S.D.N.Y.1972). Though technically a "sale", the July 3 shipment was not "publicly distributed" within the purview of the Texas statute.

 Blue Bell's July 5 shipment similarly failed to satisfy the prerequisites of a bona fide use in trade. Elementary tenets of trademark law require that labels or designs be affixed to the merchandise actually intended to bear the mark in commercial transactions. Persha v. Armour & Co., 239 F.2d 628 (5th Cir. 1957). Furthermore, courts have recognized that the usefulness of a mark derives not only from its capacity to identify a certain manufacturer, but also from its ability to differentiate between different classes of goods produced by a single manufacturer. Western Stove Co. v. George D. Roper Corp., 82 F.Supp. 206 (S.D.Cal.1949). Here customers had ordered slacks of the Mr. Hicks species, and Mr. Hicks was the fanciful mark distinguishing these slacks from all others. Blue Bell intended to use the Time Out mark on an entirely new line of men's sportswear, unique in style and cut, though none of the garments had yet been produced.

 While goods may be identified by more than one trademark, the use of each mark must be bona fide. See, e. g., Old Dutch Foods, Inc. v. Dan Dee Pretzel & Potato Chip Co., 477 F.2d 150 (6th Cir. 1973) (continuous utilization of the second mark for over thirty years). Mere adoption of a mark without bona fide use, in an attempt to reserve it for the future, will not create trademark rights. Circle Cab Co. v. Springfield Yellow Cab Co., 137 N.E.2d 137 (Ohio App. 1954); Western Leather Goods v. Blue Bell, 178 U.S.P.Q. 382

(TTAB 1973). In the instant case Blue Bell's attachment of a secondary label to an older line of goods manifests a bad faith attempt to reserve a mark. We cannot countenance such activities as a valid use in trade. Blue Bell therefore did not acquire trademark rights by virtue of its July 5 shipment.

We thus hold that neither Farah's July 3 shipment nor Blue Bell's July 5 shipment sufficed to create rights in the Time Out mark. Based on a desire to secure ownership of the mark and superiority over a competitor, both claims of alleged use were chronologically premature. Essentially, they took a time out to litigate their differences too early in the game. The question thus becomes whether we should continue to stop the clock for a remand or make a final call from the appellate bench. While a remand to the district court for further factual development would not be improper in these circumstances, we believe the interests of judicial economy and the parties' desire to terminate the litigation demand that we decide, if possible, which manufacturer first used the mark in trade.

 Careful examination of the record discloses that Farah shipped its first order of Time Out clothing to customers in September of 1973.[8] Blue Bell, approximately one month behind its competitor at other relevant stages of development, did not mail its Time Out garments until at least October.[9] Though sales to customers are not the *sine qua non* of trademark use, *see* New England Duplicating Co. v. Mendes, *supra,* they are determinative in the instant case. These sales constituted the first point at which the public had a chance to associate Time Out with a particular line of sportswear. Therefore, Farah established priority of trademark use; it is entitled to a decree permanently enjoining Blue Bell from utilization of the Time Out trademark on men's garments.

The judgment of the trial court is affirmed.

---

8. Appendix at 498.

9. Appendix at 391.