**Appellants' Motion for Rehearing Overruled; Affirmed and Substitute Memorandum Opinion filed August 25, 2015.**



In The

# Fourteenth Court of Appeals

### NO. 14-14-00234-CV

**HARDRIDERS MOTORCYCLE CLUB ASSOCIATION, HARDRIDERS MOTORCYCLE CLUB FORT BEND COUNTY CHAPTER, HARDRIDERS MOTORCYCLE CLUB BRAZORIA COUNTY CHAPTER, HARDRIDERS MOTORCYCLE CLUB LAFAYETTE CHAPTER, HARDRIDERS MOTORCYCLE CLUB GALVESTON COUNTY CHAPTER, HARDRIDERS MOTORCYCLE CLUB BEAUMONT CHAPTER, EFREM SEWELL, MILO SHEPARD, THOMAS MEEKS, JOSEPH GUILLORY, AND TONY THOMAS, Appellants**

**V.**

**HARDRIDERS, INC., WAVERLY NOLLEY, AND SHANNON MAYFIELD, Appellees**

**On Appeal from the 151st District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-37278**

## S U B S T I T U T E   M E M O R A N D U M   O P I N I O N

We issued a memorandum opinion in this case on July 7, 2014, affirming the trial court's judgment. Appellants filed a motion for rehearing. Without changing the disposition of the case, we deny the motion for rehearing, withdraw our

previous opinion, and issue this substitute opinion.

In this dispute between rival factions within a motorcycle club, the appellants contend that the trial court erred by refusing to disregard the jury's finding that the corporation had a superior right to ownership of the club's name, logo, and website over the unincorporated association, and by rendering judgment in favor of the corporation and enjoining others from any and all use of the club's name, logo, and website. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Sometime in 2000, a group of friends, including Jimmy Davis, Darvin Scott, Efrem Sewell, and Waverly Nolley, began riding motorcycles together. The group decided that they should form a motorcycle club. The group also created a charter to govern their activities and elected officers, making Davis the club's first president and Scott the vice-president.

In August 2000, Davis filed an assumed name certificate in Harris County for use of the name "Hard Riders." Davis also designed and paid for the creation of a signature logo for the club, which included the words "Hard Riders" in old English font above orange and yellow flames. The group commonly referred to themselves as the "Hard Riders Motorcycle Club" and the graphic design became known as "the flames."

In 2003, Davis decided to leave the club. Scott was elected president and another member, Don Sutton, became vice-president. After Davis left, Scott and Sutton filed another assumed name certificate for the club, identifying it as "Hard Riders of Houston." The club also opened a bank account under the name "Hard Riders of Houston" and obtained bank cards for the officers in that name. The club advertised motorcycle rallies to the public using the name "Hard Riders of Houston" and displaying the flames. Around 2004, Milo Shepard and Thomas

2

Meeks joined the club.

In 2005, an individual who had attended one of the motorcycle rallies was involved in an accident while leaving the rally. This incident created concern among the club's membership that they could be personally liable should someone become injured at one of their sponsored events, so they discussed incorporating the club. Scott, with the assistance of Sewell, who was a lawyer, had articles of incorporation prepared and filed for "HardRiders, Inc."[1] Sewell employed a service to prepare the documentation. Although Sewell was apparently unsure about the type of corporation to form, ultimately it was formed as a close corporation with Scott and another member, Herman Frazier, as the two shareholders.

After the incorporation, Scott informed members that they were now "Inc.'d." The club's members also continued to attend meetings and pay dues as they had done previously. At the end of 2005, the club hosted a Christmas event, advertising the Hard Riders name and flames logo and presenting an ice sculpture with the flames and the name "Hard Riders, Inc." emblazoned across it. In January 2006, the club purchased a trailer with money from the bank account and registered it in the name of HardRiders, Inc.

Scott resigned as president in 2007 and Meeks became president. Shepard began serving as treasurer. Shepard ordered checks for the Hard Riders of Houston bank account to include the name "Hard Riders, Inc." Shepard also wrote and deposited checks for membership dues into the club's account. Later, Shepard purchased the domain name, hardridersmc.com, from GoDaddy.com using the club's bank card.

Shepard later discovered that HardRiders, Inc.'s corporate status had been

---

[1] The exhibits variously refer to "Hard Riders, Inc.," "Hardriders, Inc.," "HardRiders, Inc.," and "Hard Riders Inc." For consistency, we will refer to the incorporated entity as "HardRiders, Inc." unless otherwise specified.

3

forfeited in 2007 for nonpayment of state franchise taxes. Shepard applied for reinstatement, which was approved in 2010. That same year, Shepard filed an assumed name certificate for "Hard Riders Motorcycle Club," identifying the legal name of the entity filing the assumed name as HardRiders, Inc. Meeks, as president of the club, likewise filed an assumed name certificate in Louisiana for use of the name of "Hard Riders Motorcycle Club" on behalf of HardRiders, Inc. Meeks represented in the application that HardRiders, Inc. first used this name on August 1, 2000.

As membership grew beyond Houston, the club began to prepare for a national organization. Club members attended several meetings where bylaws were crafted and voted on. The "Hard Riders Inc. Bylaws" reflected that the name of the club was "the Hard Riders Motorcycle Club, also known as Hard Riders of Houston." The bylaws specified that, among other things, members of the club could not be a member of any other motorcycle club during their membership with HardRiders, Inc. Along with the bylaws, the members also voted in favor of adopting the "Hard Riders Motorcycle Club National Constitution." Section III of the document identified the club as "HardRiders, Inc. (aka Hard Riders Motorcycle Club)." Article IX identified the club's logo as the flames with Hard Riders written in old English font above it.

After the new constitution and bylaws were adopted, concerns arose that a national board must be elected before the constitution's provisions could be implemented. On March 1, 2011, Waverly Nolley was elected national president in a contested election.

Unhappy with the outcome of the election, Sewell filed a trademark application with the United States Patent and Trademark Office for the flames logo in his own name. Sewell and Shepard together also formed a nonprofit corporation called Hard Riders Motorcycle Club, and included the flames logo in the

4

incorporation document. Shepard, Meeks, and Joseph Guillory were named as directors of the corporation. Shepard also contacted GoDaddy.com to change the ownership information for the domain name "hardridersmc.com" from HardRiders, Inc. to his corporation, Lost Creek Group.

In the summer of 2011, HardRiders, Inc. filed suit against Sewell, Shepard, Meeks, Guillory, and another club member, Tony Thomas. HardRiders, Inc. later amended its petition to add as a defendant the nonprofit corporation Hard Riders Motorcycle Club. At the time of trial, HardRiders Inc.'s live petition included a request for declaratory and injunctive relief as well as claims of civil theft, trademark and trade name dilution, unfair competition, conversion, and trademark infringement. HRMCA and several chapters of the HardRiders Motorcycle Club intervened and asserted many of the same claims against HardRiders, Inc.

In August 2013, the case was tried to a jury over the course of twelve days. More than 200 exhibits were admitted, and at the conclusion of the trial the jury was given a ninety-nine page jury charge. Relevant here, the jury found in Question 1 that HRMCA began as an unincorporated association in March 2000, and in Question 1a, the jury found that it "still existed." In Question 3, the jury was asked whether HardRiders, Inc. or HRMCA "held the superior right to the trademark (flames and colors), trade name ("Hard Riders"), and website address (hardridersmc.com") of the Hard Riders organization as of February 28, 2011." The jury answered "HardRiders, Inc."

Following the verdict, both sides filed motions to disregard the jury's findings, and the trial court held a hearing on the parties' arguments. On December 26, the trial court signed a judgment finding that HardRiders, Inc. had the superior rights of ownership to the trademark, trade name, and website, and declaring that "the assumed name/trade name of 'Hard Riders,' the trademark consisting of the flames and logo, and the webpage hardridersmc.com, and the lease agreement for

the webpage hardridersmc.com is the property of HARDRIDERS, INC. with all rights and privileges pertaining thereto." The trial court also permanently enjoined the individual defendants from using the trade name, trademark, and website. HRMCA and the individual defendants moved for a new trial, which was denied.

### ISSUES AND ANALYSIS

On appeal, HRMCA contends that the rights to the Hard Riders trademark, trade name, and website belong to it, not HardRiders, Inc.[2] According to HRMCA, the evidence and the jury's answers to Question 1 and 1a show that HRMCA is an incorporated association that was first formed in March 2000 and still exists. HRMCA notes that the club was formed by Jimmy Davis and its other founding members, and when it was formed, Davis came up with the name and logo. In contrast, HardRiders, Inc. did not exist until 2005, when it was formed as a close corporation to insulate its members from liability.

As between the two distinct legal entities, HRMCA argues that it was not only first in time, but the first to use the trademark and trade name and therefore necessarily had a superior right to them. HRMCA also argues that there is no evidence of any transaction by which ownership of the trademark and trade name was transferred to HardRiders, Inc. Consequently, HRMCA maintains, the trial court erred by refusing to disregard the jury's answer to Question 3, in which the jury found that HardRiders, Inc. had the superior right to the Hard Riders trademark, trade name, and website.

### A.    Standard of Review

The denial of a motion to disregard jury findings and for judgment notwithstanding the verdict is reviewed under a legal sufficiency standard. *Kamat*

---

[2] In the interest of brevity, we will refer to the appellants collectively as "HRMCA" and the appellees as "HardRiders, Inc." unless the context reflects otherwise.

*v. Prakash*, 420 S.W.3d 890, 905 (Tex. App.—Houston [14th Dist.] 2014, no pet.). In determining whether legally sufficient evidence supports the trial court's findings of fact, we consider the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not disregard it. *See id.* at 827.

A party attacking legal sufficiency relative to an adverse finding on which it had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). We review the entire record to determine if the contrary proposition is established as a matter of law only if there is no evidence to support the jury's finding. *See id.* Anything more than a scintilla of evidence is legally sufficient to support the jury's finding. *See City of Keller*, 168 S.W.3d at 822. The final test for legal sufficiency is whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827. The jurors are the sole judge of witness credibility and the weight to give witnesses' testimony. *Id.* at 819.

Applying this standard of review, HRMCA's burden on appeal is to demonstrate that: (1) there is no evidence to support the jury's finding that HardRiders, Inc. held the superior right to the trademark, trade name, and website, and (2) the jury's other findings along with the conclusive evidence at trial established that HRMCA held superior rights to the Hard Riders trademark, trade name, and website as a matter of law. *See Dow Chem. Co.*, 46 S.W.3d at 241.

**B.** **Legally Sufficient Evidence Exists to Show that Hard Riders, Inc. Held a Superior Right to the Hard Riders Trademark, Trade Name, and Website**

HRMCA sought to establish its right to the Hard Riders trade name and trademark under the common law. To prevail on a common-law trademark infringement claim, HRMCA had the burden to prove the following elements:

1.  the name must be eligible for protection;
2.  the party claiming infringement is the senior user of the name;
3.  the mark and the mark of a competitor are likely to confuse consumers; and
4.  where a plaintiff seeks to enjoin the infringing mark, that the likelihood of confusion will cause irreparable injury for which there is no adequate legal remedy.

*All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex. App.—Fort Worth 1999, no pet.); *Zapata Corp. v. Zapata Trading Int'l, Inc.*, 841 S.W.2d 45, 47 (Tex. App.—Houston [14th Dist.] 1992, no writ). The elements of a common-law trademark infringement action under Texas law are the same as those of a federal trademark infringement action. *See Zapata Corp.*, 841 S.W.2d at 47.

Ownership of a trademark is established by use, not registration. *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin, Tex.*, 909 F.2d 839, 842 (5th Cir. 1990); *see Blue Bell, Inc. v. Farah Mfg. Co., Inc.*, 508 F.2d 1260, 1265 (5th Cir. 1975). The first one to use a mark is generally held to be the "senior" user and is entitled to enjoin other "junior" users of the mark. *Union Nat'l Bank of Tex., Laredo*, 909 F.2d at 842–43. The senior user's priority in the adoption and use of a trademark or trade name "confers a superior right to the use thereof." *Burge v. Dallas Retail Merchants Ass'n*, 257 S.W.2d 733, 735 (Tex. Civ. App.—Dallas 1953, no writ).

Both HRMCA and HardRiders, Inc. sought ownership and protection of the

same trade name, trademark, and website. There was no dispute as to whether the trade name, trademark, and website were eligible for protection, whether their use would be likely to confuse, or whether the likelihood of confusion was sufficient to cause irreparable injury. The only relevant issue the jury was asked to resolve was which of the two parties had a superior right to ownership of the trade name, trademark, and website.

To place HRMCA's evidentiary challenge in context, we note that Questions 1 and 1a did not concern any issue relating to ownership of a trademark; the questions were limited to whether HRMCA ever existed, when it began, and whether it still exists. In contrast, Question 3 asked the jury which party held the superior right to the trademark, trade name, and website. Significantly, Question 3 did not include any instructions concerning the application of trademark law to the facts of the case, and the jury was not instructed on the meaning of "senior user." The jury also was not provided a definition or instruction about what constitutes a "superior right." Instead, the jury was merely asked:

> Who held the superior right to the trademark (flames and colors), trade name ("Hard Riders"), and website address (hardridersmc.com") of the Hard Riders organization as of February 28, 2011?
>
> Answer: "Hard Riders, Inc." or "Hard Riders Motorcycle Club Association"
>
> Answer: _____

Of the two options, the jury chose HardRiders, Inc.

Neither party objected to Question 3 at trial. When the parties have not objected at trial to the substance of the law set forth in the jury charge, we review the sufficiency of the evidence in light of the legal standards contained in the charge. *See, e.g.*, *Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). This is true

9

even if the charge contains an incorrect statement of the law. *See Barnes v. Mathis*, 353 S.W.3d 760, 765 (Tex. 2011) (per curiam); *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005).

Here, the trial court's charge instructed the jury: "If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition." The ordinary meaning of the word "superior" is "one who is above another in rank, office, or station" or "one higher in quality or merit." WEBSTER'S NEW EXPLORER DICTIONARY AND THESAURUS 519 (1999). Absent a definition of "superior right" or any instructions concerning its application as an element of a trademark infringement claim, the jury was entitled to apply the ordinary meaning of "superior" and find in favor of the party having a greater or more meritorious right to the trademark, trade name, and website. *See Barnes*, 353 S.W.3d at 765; *Romero*, 166 S.W.3d at 221.

HRMCA contends that because the jury found in Question 1a that HRMCA "existed as an unincorporated association" that was first formed in "March 2000," the jury necessarily found that HRMCA was the senior user of the trade name, trademark, and website. HRMCA also contends that the evidence at trial was conclusive that, as between HardRiders, Inc. and HRMCA, HRMCA was the senior user. As support for these propositions, HRMCA points to the undisputed evidence that Jimmy Davis, the club's founder, created the Hard Riders name and flames logo. However, conception of a mark alone does not prove ownership. *See Blue Bell, Inc.*, 508 F.2d at 1265 ("[N]either conception of the mark, nor advertising alone establishes trademark rights at common law.") (citations omitted). Moreover, the jury was asked in Question 1a to decide only whether HRMCA existed, not whether it was a senior user of the trade name, trademark, and website. The jury subsequently found that HardRiders, Inc. had a superior right to the trademark, trade name, and website.

10

At trial, the parties contested whether the name and flames logo were first used by HRMCA or another entity. Davis, the club's founder, disputed whether the club was known as HRMCA. Davis testified that he had never heard or used the name Hard Riders Motorcycle Club Association, and if the name was used, it was used after he left the club. Davis acknowledged that a membership application identifying the club as "Hard Riders Motorcycle Club Association" and "HRMCA" looked like a document he would have created while he was with the club. However, when Davis filed the first assumed name certificate for the club in August 2000, he represented that the club's name was "Hard Riders." There was also testimony that the group commonly called themselves the "Hard Riders Motorcycle Club."

Additionally, the early club charters identifying Davis and Scott as president and vice president refer to the "Hard Riders Motorcycle Club Association," and "HRMCA," but do not contain the "Hard Riders" name in old English font or display the flames. In contrast, a presumably later charter that shows the name "Hard Riders" in old English font at the top of the first page includes references to both HRMCA and HardRiders, Inc. On the second page of the charter, the Hard Riders name and flames appear along with references to "Hard Riders Inc.," and a section listing the requirements for members includes a rule that members "must not be a member of any other motorcycle club during your membership with Hard Riders, Inc."

Contrary to HRMCA's assertion, the jury's finding that HRMCA existed as an unincorporated association before HardRiders, Inc. does not equate to a finding that HRMCA was the senior user. Nor does the evidence that Davis, the club's founder, created the signature name and flames logo conclusively demonstrate HRMCA's senior use of the trade name and trademark. *See Blue Bell, Inc.*, 508 F.2d at 1265. HRMCA points to no other evidence to support its assertion that

11

HRMCA was the senior user of the trade name and trademark. Further, there was some evidence that the "Hard Riders" name and flames logo was used by HardRiders, Inc. The jury resolved the dispute in Question 3 when it determined that HardRiders, Inc. had a superior right to the use of the trade name, trademark, and website.

HRMCA also argues that HardRiders, Inc. did not present any evidence of a transfer of the assets from HRMCA to HardRiders, Inc., but instead relied on a theory of "some sort of organic succession of entities" when HardRiders, Inc. was formed. Courts have stated generally that merely incorporating an unincorporated association is insufficient to transfer the unincorporated association's property to the corporation. *See Edwards v. Old Settlers' Ass'n*, 166 S.W. 423, 427 (Tex. Civ. App.—Austin 1914, writ ref'd). According to HRMCA, HardRiders, Inc.'s "succession" theory is unsupported by either the facts or the law.

First, HRMCA asserts that HardRiders Inc.'s own counsel and a plaintiff, Waverly Nolley, testified that there was no agreement to transfer ownership or a license to use the trademark, the name, and website to HardRiders, Inc., only "the succession of names of the club." In context, the exchange was as follows:

> Q.    [HRMCA's counsel] What agreement does HardRiders, Inc., have? HardRiders, Inc., is the one filing the lawsuit here?
>
> A.    [Nolley] Yes, sir. You know, one of the witnesses put it, I think, very eloquently but simple, the agreement of trust. That's the agreement that I have.
>
> Q.    So there was never any agreement where you have a meeting of the minds and an actual transfer of property, did, Mr. Nolley?
>
> A.    Yes, sir. The meeting of the minds is the succession of names of the club where the succession and names of the club changes but not the members.
>
> Q.    When did that happen?
>
> A.    That happened at the end of the succession of each different name. That's when it happened.

We conclude that Nolley's testimony does not conclusively establish that no transfer of property took place. Nolley expressly disagreed that no property was transferred and stated that there was a meeting of the minds and a transfer through the successive club names. The jury could have understood Nolley's explanation as consistent with an implied agreement transferring the trade name, trademark, and website from one incarnation of the club to another. Our courts have recognized that an implied contract may be inferred from evidence of the parties' conduct and course of dealing, and that the creation of an implied contract is a question of fact for a jury. *See Haws & Garrett Gen. Contractors, Inc. v. Gorbett Bros. Welding Co., Inc.*, 480 S.W.2d 607, 609–10 (Tex. 1972).

HRMCA also contends, however, that "some formal transfer of title was required" if HardRiders, Inc. was to prove title to the trademark and logo over HRMCA's superior rights. According to HRMCA, HardRiders, Inc.'s only evidence "consists of a generic desire or understanding by some of the witnesses that the act of incorporation would automatically transfer ownership of the assets" to HardRiders, Inc. It is undisputed that no formal document of transfer was produced, but HRMCA does not direct us to any case law or statute requiring a "formal" transfer of title in a common law trademark action.[3] Moreover, case law cited by HRMCA suggests that no formal transfer of property is required when an unincorporated association incorporates, so long as the members of the

---

[3] On rehearing, HRMCA points out that section 16.061 of the Texas Business and Commerce Code requires that an assignment of a trademark "must be made by a properly executed written instrument . . . ." *See* Tex. Bus. & Com. Code § 16.061(b). However, HRMCA does not allege a statutory violation. Moreover, remedies provided under the code are available only to owners of registered marks, and HRMCA does not contend it owns a registered trademark. *See id.* § 16.104(a) ("An owner of a mark registered under this chapter may bring an action to enjoin the manufacture, use, display, or sale of any counterfeits or imitations of a mark."); *Sandy Int'l, Inc. v. Hansel & Gretel Children's Shop, Inc.*, 775 S.W.2d 802, 806 (Tex. App.—Dallas 1989, no pet.) (absent evidence of a written assignment, plaintiff was not a registrant and lacked standing to seek relief for trademark infringement under Texas trademark statute).

unincorporated association and the corporation take some action to transfer the ownership of the property. *See Edwards*, 166 S.W. at 427 ("Appellant insists that the judgment should be reversed for the reason that there was no transfer from the Old Settlers' Association, unincorporated, nor from [the Association's trustees] to the Old Settlers' Association, incorporated. There was delivery of possession, and this is all that was necessary.").

The issue of whether there was a transfer of the property from one entity to another was hotly contested at trial, and HardRiders, Inc. presented evidence and witness testimony that transfers were in fact made. Davis testified that he registered the club name as "Hard Riders," and when he left the club he transferred the care and custody of the flames logo to Darvin Scott as president of the club. Subsequently, Scott filed the assumed name certificate in Harris County for use of the name "Hard Riders of Houston," not HRMCA. After that, the club used the Hard Riders name and flames on advertisements of motorcycle events and in connection with the website hardridersofhouston.com, the predecessor to the hardridersmc.com website.

Scott testified that when concerns arose about liability in 2005, the members of Hard Riders of Houston voted to incorporate the club and transfer its assets to HardRiders, Inc. Scott also testified that if HRMCA had any assets before 2003, the membership understood that those assets were transferred to Hard Riders of Houston because "that's what the membership wanted." Although Scott did not recall any written transfer agreements, he testified that the transfer of the assets was the "number one thing" and that the transfer happened at the same time as the formation of HardRiders, Inc. Significantly, it was always his and the club's understanding that "everything was supposed to have been transferred." Scott also testified that he engaged Sewell to represent HardRiders, Inc., and to handle all aspects of the incorporation.

Michelle Oxindine, who served as secretary for the club, also testified that she recalled a meeting of the members in which it was discussed that the club's assets were to be transferred to an incorporated entity and that Sewell was going to do the paperwork. Additionally, Oxindine and Scott both testified that Milo Shepard was charged with obtaining the hardridersmc.com website on behalf of the club and that the website belonged to HardRiders, Inc.

Herman Frazier, who served as vice-president of the club and was a witness for the defense, also recalled a meeting in which there was "strong agreement" among the members to become HardRiders, Inc. to protect them from liability, and that the decision was "no-brainer." And although Frazier could not recall a specific meeting in which the transfer of assets was discussed, he always understood that since 2005, HardRiders, Inc. owned the club's assets, including the name and logo. George Provost, another founding member and defense witness, testified that he remembered a meeting in 2005 in which the members discussed the Hard Riders organization "succeeding into HardRiders, Inc." There was no evidence that only a partial assignment of the trade name, trademark, and website was made, and no evidence that any trade name or mark was merely licensed.

The jurors were also presented with evidence and testimony that the assumed name "Hardriders Motorcycle Club" was filed on behalf of HardRiders, Inc., as well as the bylaws acknowledging that the flames logo belonged to HardRiders, Inc. The jury also could have considered the club's rule that members could not be members in any other motorcycle club while they were members of HardRiders, Inc., to mean that they could not also be members of HRMCA at the same time they were members of HardRiders, Inc. Additionally, the jury may have discounted contrary testimony from some of HRMCA's members, given their attempts after the 2011 election to register the flames logo, form a new corporation named "Hard Riders Motorcycle Club," install themselves as officers of the club,

15

and transfer ownership of the hardridersmc.com website for themselves. Viewing the evidence in the light most favorable to the verdict, the jury could have reasonably inferred that the club membership decided to incorporate to protect themselves from personal liability, and that that all of the club's assets, including the Hard Riders name, the flames logo, and the website address, were transferred to HardRiders, Inc. for the purpose of protecting those assets.

Such an inference is further supported by evidence showing that since 2005, the club continued collecting membership dues, owning property, renting venues, and conducting business generally through at least 2011 as HardRiders, Inc. Additionally, after incorporation, the club used the Hard Riders of Houston bank account as HardRiders, Inc.'s account. Shepard, as the club's treasurer, ordered checks for the bank account in the name of HardRiders, Inc., and began to deposit and issue payments in the name of HardRiders, Inc. Shepard also wrote personal checks to HardRiders, Inc. for membership dues and deposited them into the Hard Riders of Houston account. Payments to various vendors or individuals were made with funds from the bank account by check in the name of Hard Riders, Inc.,[4] and Provost testified that the money in the bank account belonged to HardRiders, Inc.

In summary, the jury charge as written authorized the jury to find in favor of the party having an undefined "superior right" to the trademark, trade name, and

---

[4] In a post-submission letter, HRMCA argues that evidence that checks were made out to HardRiders, Inc. and that HardRiders, Inc. appeared on checks and deposit slips was not evidence that all assets were transferred. At best, HRMCA argues, the two entities shared use of the bank account created before HardRiders, Inc.'s existence. And even assuming such an inference could be made, HRMCA continues, it would be speculation and "no better than an inference that the account intentionally remained part of HRMCA given that the sole purpose of HardRiders, Inc.'s. creation was to protect the associations' members and its assets from liability." However, jurors are entitled to draw from the evidence whatever inferences they wish, so long as more than one inference is possible, and in our review we must assume jurors made all inferences in favor of their verdict if reasonable minds could and disregard all other inferences. *City of Keller*, 168 S.W.3d at 821; *see also Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (noting that "[i]f circumstantial evidence will support more than one reasonable inference, it is for the jury to decide which is more reasonable").

16

website. Based on the evidence presented and the charge submitted, more than a scintilla of evidence exists from which the jury reasonably could have concluded that HardRiders, Inc.'s right to the trademark, tradename, and website was "superior" to HRMCA's based on the common understanding of the word "superior" to mean "greater" or "more meritorious." Moreover, viewing the evidence in the light most favorable to the jury's finding, the jury could have determined that the members of the original unincorporated association (whether Hard Riders or HRMCA) and its successor, Hard Riders of Houston, transferred all of the club's assets, including the trademark, tradename, and website, to HardRiders, Inc. by an implied agreement of the members when the club was incorporated in 2005 for the purpose of protecting its members from liability. *See City of Keller*, 168 S.W.3d at 819–21. Therefore, the trial court would not have erred by refusing to disregard the jury's answer to Question 3.

## CONCLUSION

We overrule the appellants' issues and affirm the trial court's judgment.

/s/  Ken Wise
Justice

Panel consists of Justices Christopher, Brown, and Wise.

17