**Harry T. KEANE, Jr., Plaintiff,**

v.

**FOX TELEVISION STATIONS, INC., et al., Defendants.**

No. CIV.A.H–03–1642.

United States District Court, S.D. Texas, Houston Division.

Jan. 8, 2004.

Sean F Greenwood, Heard Robins et al, Ryan Bradley Bormaster, Miller & Asoc PLLC, Houston, TX, for Harry T Keane, Jr, plaintiff.

Marc A Sheiness, Sheiness Scott et al, Houston, TX, for Fox Television Stations Inc, Kriv Fox 26 (Houston TX), Simon Cowell, FremantleMedia of North America Inc, Fremantlemedia Ltd.

Robert Charles Shaddox, Winstead Sechrest et al, Houston, for 19TV Ltd.

### MEMORANDUM AND ORDER

LAKE, District Judge.

Plaintiff, Harry T. Keane, Jr., brought this action against defendants, Fox Television Stations, Inc., Simon Fuller, FremantleMedia of North America, Inc., Simon Cowell, FremantleMedia, Ltd., 19 TV, Ltd., and Nigel Lythgoe, alleging federal trademark infringement and state common law claims for trademark infringement, unfair competition, breach of implied contract, misappropriation of idea/trade se-

crets, and quantum meruit.[1] Pending before the court is the FMNA Defendants' Third Motion to Dismiss Pursuant to Federal Rule 12(b)(6) (Docket Entry No. 42) brought by defendants Fox Television Stations, Inc., FremantleMedia of North America, Inc., and Simon Cowell (collectively, "FMNA").[2] For the reasons set forth below, FMNA Defendants' Third Motion to Dismiss (Docket Entry No. 42) will be granted.

## I. *Standard of Review*

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Keane has failed to state a claim for which relief can be granted. A Rule 12(b)(6) motion to dismiss requires accepting as true the factual allegations contained in the complaint and construing the complaint in the light most favorable to the plaintiff. *Vulcan Materials Co. v. City of Tehuacana,* 238 F.3d 382, 387 (5th Cir. 2001). The motion should be denied if the plaintiff has alleged any set of facts to support a claim entitling the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *Leffall v. Dallas Indep. School Dist.,* 28 F.3d 521, 524 (5th Cir.1994).

However, a party seeking to avoid dismissal "must plead specific facts, not mere conclusory allegations." *Guidry v. Bank of LaPlace,* 954 F.2d 278, 281 (5th Cir.1992). Furthermore, courts "are not required to accept as true conclusory allegations which are contradicted by documents referred to in the complaint." *Warren v. Fox Family Worldwide, Inc.,* 328 F.3d 1136, 1139 (9th Cir.2003) (citations

omitted). *See also Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir.1975) (concluding that when plaintiff attaches documents to a complaint that contradict statements in the complaint itself, the more specific document controls). Complaints " 'must contain either direct allegations on every material point necessary to sustain a recovery ... or contain allegations from which an inference fairly may be drawn that evidence on these material points will be introduced at trial.' " *Campbell v. City of San Antonio,* 43 F.3d 973, 975 (5th Cir.1995) (*quoting* 3 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1216 (2d ed.1990)). While dismissal of a claim under Rule 12(b)(6) is generally disfavored, the court should exercise its power to dismiss a complaint if it lacks an allegation regarding an element required to obtain relief. *Blackburn v. City of Marshall,* 42 F.3d 925, 931 (5th Cir.1995) (citations omitted).

## II. *Factual and Procedural History*

According to Keane's Second Amended Complaint, in 1997 he produced a stage musical called "Elvis, Then, Now & Forever." [3] Keane alleges that his stage production "was an earlier iteration" of an idea he called "American Idol" that bears a strong resemblance to the Fox television show later produced with that name.[4] Keane alleges that his Elvis musical "served as a springboard for his later refinements to American Idol," i.e., Keane contends that his Elvis musical stage show evolved into an entirely different idea: a concept for a television talent show, which he never pro-

---

**1.** See Plaintiff's Second Amended Complaint, Docket Entry No. 38 at ¶¶ 53–113.

**2.** The record does not contain evidence that Keane has served the other four defendants—Simon Fuller, Nigel Lythgoe, FremantleMedia, Ltd., and 19 TV Ltd.

**3.** Second Amended Complaint, Docket Entry No. 38 at ¶ 20.

**4.** *Id.*

duced but which he tried to sell and for which he tried to obtain backers.[5]

Keane claims that the concept underlying "Elvis, Then, Now & Forever" steadily expanded in his mind, he made notes, and he developed alternative titles for his idea: "Ultimate Starsearch," "American Idol," and "American Superstars."[6] He does not claim that he ever wrote or produced a stage show or television program bearing any of those names. Instead, he alleges that he put together a "descriptive sales packet" in which he used the mark AMERICAN IDOL and described his idea for a stage or television talent show that might be called "American Idol."[7] A copy of the document that Keane characterizes as a "descriptive sales packet" is attached as Exhibit G to both his Second Amended Complaint (Docket Entry No. 38) and his Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss (Docket Entry No. 45). Keane repeatedly refers to his "descriptive sales packet" and cites the court to the attachment to show that he has alleged facts demonstrating that his "American Idol" idea/mark was used in interstate commerce before the Fox television show called *American Idol* premiered.

Keane claims that he prepared his "descriptive sales packet" to send to "prospective financial investors, business associates and production companies."[8] He claims that he sent it to production companies whose names and addresses he retrieved from *Variety* magazine.[9] Keane has attached a page from that magazine to his Second Amended Complaint as evidence of the impetus behind his mailings.[10] The page contains production companies' advertisements in which they list contact information and "product highlights"—i.e., the companies' imminent releases of new films, videos, and/or television shows.[11] Pearson TV International ("Pearson") is among the production companies whose advertisements appear on the particular page reproduced as Keane's Exhibit H. Keane alleges that Pearson is owned by one of the defendants, Simon Fuller.[12] Keane also alleges that Pearson changed its name and is now known as FremantleMedia NA, another defendant.[13]

None of the advertisements in Keane's Exhibit H contain any text suggesting that the companies were soliciting ideas for future productions from *Variety*'s readers; rather, the advertisements promote the companies' own completed products.[14] Keane does not allege that he had any prior relationship with any of the companies to which he allegedly mailed his "descriptive sales packet." Nor does he claim that, in sending his packet, he was responding to an explicit solicitation. Instead, he alleges that "industry custom" supports his contention that advertisements in trade magazines such as those

---

5. *Id.* The court finds it problematic that Keane describes a 1997 production of "Elvis, Then, Now & Forever" as an "earlier iteration" of the "American Idol" idea that he alternatively claims he had already developed as far back as 1994 and that he "later refine[d]" in the wake of the Elvis production of 1997. *Compare id.* at ¶ 17 *with id.* at ¶ 20 *and* Exhibit A.

6. *Id.* at ¶ 17.

7. *Id.* at ¶ 26.

8. *Id.*

9. *Id.* at ¶¶ 26–28.

10. See *id.*, Exhibit H.

11. See *id.*

12. *Id.* at ¶ 28.

13. *Id.* at ¶ 29.

14. *Id.*, Exhibit H.

depicted in Exhibit H are understood within the industry as solicitations for ideas.[15]

Keane alleges that Exhibit G, attached to his Second Amended Complaint, is the "descriptive sales packet" that he sent to production companies, including Pearson. Exhibit G includes a cover letter on "NuVista Pictures, Inc." stationery;[16] "NuVista" is a company that Keane started in Iowa in 1998, which no longer exists.[17] The cover letter is dated May 8, 1998, and it contains Keane's signature.[18]

On May 27, 1998, twenty-one days after the date on the cover letter of Keane's "descriptive sales packet,"[19] Keane alleges that he placed handwritten notes that he had made back in 1994 in an envelope and mailed it to himself.[20] He alleges that these notes describe his concept for a nationally televised talent contest whose proposed names included "American Idol."[21] He claims that this postmarked mailing is still in his possession and remains unopened.[22]

Keane alleges that some time later he also "advertised" his "American Idol" idea on the Internet.[23] He does not describe the content of those efforts or provide any supporting documentation.

Keane does not allege that he received any offers for sponsorship in response to either his mass-mailing campaign or his Internet postings. Instead, he alleges that his "continual" efforts to procure backers were "unsuccessful."[24]

In addition to the mailings and Internet postings, Keane alleges that, intermittently from 1995 through 2001, he approached several people about investing in or helping to develop his "American Idol" idea. Keane alleges that in 1995 he approached Mitchell Steven Samboceti, who identifies himself as an actor. Keane claims that he described his "American Idol" idea to Samboceti in hopes of enlisting his aid in producing Keane's "American Idol" talent competition idea.[25] Keane alleges that at the end of 1996 or beginning of 1997 he then discussed the idea with Thomas Craig Maples.[26]

Keane alleges that in May of 1998 he discussed his "American Idol" idea with his uncle, Manuel Gerado, who helped him further develop the idea.[27] Keane claims that some time in 1998 he also discussed

15. *Id.* at ¶ 29.

16. *Id.*, Exhibit G.

17. FMNA contends that the State of Iowa administratively dissolved NuVista on August 3, 2000. See Brief in Support of FMNA's Third Motion to Dismiss, Docket Entry No. 43 at ¶ 18, n. 10. Keane does not allege facts contravening this contention.

18. Second Amended Complaint, Docket Entry No. 38, Exhibit G.

19. The court finds it puzzling that Keane characterizes the alleged mailing of his handwritten notes about "American Idol" as an act done "in *anticipation* of soliciting investors" when those notes were mailed at least three weeks *after* Keane alleges that he had already mailed his "descriptive sales packet" to production companies whose names he had found in *Variety* magazine. *Compare id.* at ¶ 22 *with id.* at ¶ 28 (emphasis added).

20. *Id.* at ¶ 22 and Exhibit A.

21. *Id.*

22. *Id.*

23. *Id.* at ¶ 30.

24. *Id.* at ¶ 34.

25. *Id.* at ¶ 18, and see Affidavit of Mitchell Steven Samboceti, *id.*, Exhibit B.

26. *Id.* at ¶ 19, and see Affidavit of Thomas Craig Maples, *id.*, Exhibit C.

27. *Id.* at ¶ 21.

his idea with his father-in-law, David O'Donnell, and that O'Donnell prepared a computer-generated set design for Keane's "American Idol" show based on a hand drawing that Keane had previously made.[28] In an affidavit attached to Keane's Second Amended Complaint O'Donnell states that their discussion took place in Marshalltown, Iowa, and that the set was designed with the hope that Keane could produce a musical talent competition in Marshalltown that "would generate enough appeal so as to allow [Keane] to televise it on a national level."[29] O'Donnell's affidavit does not state that Keane referred to his idea as a show to be called "American Idol."[30]

Keane's allegations do not clarify whether the refinements that Gerado allegedly suggested and the set design that O'Donnell produced existed before or after Keane reputedly mailed his "descriptive sales packet" to production companies "[o]n or about May 8, 1998."[31]

Keane claims that in the fall of 1999 he discussed his "American Idol" idea with Daniel Schomaker.[32] Keane attaches Schomaker's deposition that his attorney took on May 22, 2003, outside the presence of opposing counsel.[33] Keane, through Schomaker's deposition, alleges that Schomaker was a nineteen-year-old community college student in Marshalltown, Iowa, when he met Keane.[34] Schomaker states that Keane told him about two different ideas: "Elvis, Then, Now & Forever" and "American Super Stars or American Idol."[35] Schomaker describes the second idea as a talent show that Keane eventually wanted to have televised nationally.[36] Schomaker states that in March of 2000 he gave Keane $6,000 as an investment.[37] Keane received a $6,000 check from Schomaker in exchange for a 15% interest in Keane's company, which was memorialized in an "Agreement" that Keane has attached to his Second Amended Complaint.[38] Neither the company nor its projects are described in the "Agreement."[39] However, the "Agreement" includes an undated, handwritten interlineation that merely says "Elvis, Then, Now & Forever, A Childs [sic] Wish, American Idol."[40]

Keane asserts that his efforts to procure investors other than Schomaker were "unsuccessful."[41] However, Keane alleges that the mass-mailing of his "descriptive sales packet," his Internet postings, and his discussions with the five individuals described above are facts that he has pleaded showing that his "American Idol" mark and idea were used in interstate

28. *Id.* at ¶¶ 23–24. The only indication that the basic set design was intended for Keane's alleged "American Idol" idea is the fact that someone at some point wrote in by hand the words "American Idol, Ultimate Starsearch, American Superstars, Elvis, Then, Now & Forever, Forever Elvis" in the left margin and wrote "American Idol" and "Stars of Tomorrow" on top of the front view of the stage set graphic. *Id.*, Exhibit E.

29. *Id.*, Exhibit F.

30. *Id.*

31. *Id.* at ¶ 28.

32. *Id.* at ¶ 31.

33. *Id.*, Exhibit I at p. 2, lines 15–16.

34. *Id.* at pp. 2–3.

35. *Id.* at p. 3.

36. *Id.* at p. 4.

37. *Id.* at p. 8.

38. Second Amended Complaint, Docket Entry No. 38 at ¶¶ 31–32 and see *id.*, Exhibit J.

39. See *id.*, Exhibit J.

40. *Id.*

41. *Id.* at ¶ 34.

commerce before the Fox television show *American Idol* began airing in the summer of 2002.[42]

Keane alleges that in 2001 FremantleMedia NA, FremantleMedia, Ltd. and/or 19 TV, Ltd. produced Keane's "American Idol" idea under the name "Pop Idol." [43] In 2002 FremantleMedia and 19 TV licensed and sold the "Pop Idol" concept to Fox, which produced a similar television series in the United States, but changed the name to *American Idol*, thereby, in Keane's eyes, stealing both Keane's idea and his mark.[44] Fox's *American Idol* began airing on national television in the summer of 2002.[45]

On May 14, 2003, Keane filed this action, alleging copyright and trademark infringement, Lanham Act violations, and Texas statutory unfair competition, arising from Keane's allegation that he is the true creator of the television series *American Idol*.[46] On May 16, 2003, the court ordered Keane's attorney to file an affidavit detailing the legal and factual research performed prior to filing the lawsuit.[47] On June 4, 2003, Keane's attorney filed an affidavit and brief (Docket Entry Nos. 6 and 7) asserting that he believed that "Keane's expression of his [American Idol] idea was copyrightable as the issuance of a Certification Number creates such a pre-

sumption." [48] In other words, Keane's attorney attested to the belief that the expression of an idea that Keane describes as his "American Idol" idea had been duly copyrighted and a certificate issued.

On July 24, 2003, FMNA filed its first Motion to Dismiss with Brief in Support (Docket Entry Nos. 10 and 11). On July 30, 2003, Keane filed Plaintiff's Notice of Designation of Attorney in Charge, announcing new counsel.[49] Then, on August 15, 2003, Keane filed an Unopposed Motion for Leave to File Plaintiff's First Amended Complaint (Docket Entry No. 17). After leave was granted (Docket Entry No. 19), Keane filed his First Amended Complaint (Docket Entry No. 24) abandoning the federal trademark dilution claim raised in the original complaint. FMNA responded with a Second Motion to Dismiss with Brief in Support (Docket Entry Nos. 28 and 29) in which defendant Simon Cowell joined (Docket Entry No. 33).

On October 23, 2003, after having failed to produce evidence that the expression of his "American Idol" television talent show concept had in fact been copyrighted, Keane filed his Second Amended Complaint (Docket Entry No. 38) from which he removed his copyright infringement claim as well as claims for injury to business reputation, breach of confidence, con-

---

**42.** See *id.* at ¶ 39 and Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶¶ 10–14, where Keane argues that he had used the "American Idol" mark in commerce "since at least May 1998."

**43.** Second Amended Complaint, Docket Entry No. 38 at ¶ 35.

**44.** *Id.* at ¶ 38.

**45.** *Id.* at ¶ 39.

**46.** See Plaintiff's Original Complaint, Docket Entry No. 1 at ¶¶ 21–43.

**47.** Order, Docket Entry No. 4.

**48.** Affidavit of Ryan B. Bormaster, Docket Entry No. 6 at p. 4. Despite Mr. Bormaster's sworn statement attesting to its existence, Keane has never filed a copy of a copyright certification for his "American Idol" idea, although in his First Amended Complaint he claimed to have submitted a copyright application covering work by that name. See Plaintiff's First Amended Complaint, Docket Entry No. 24 at ¶ 27.

**49.** See Plaintiff's Notice of Designation of Attorney in Charge, Docket Entry No. 12.

version, unjust enrichment, constructive trust, and declaratory relief. Keane's Second Amended Complaint contains the following causes of action:

| | |
|---|---|
| Count I: | Federal Trademark Infringement under the Lanham Act, 15 U.S.C. § 1125(a) |
| Count II: | Common Law Trademark Infringement |
| Count III: | False Designation of Origin and Unfair Competition under the Lanham Act, 15 U.S.C. § 1125(a) |
| Count IV: | Common Law Unfair Competition |
| Count V: | Reverse Passing Off/Reverse Confusion under the Lanham Act, 15 U.S.C. § 1125(a) and Common Law |
| Count VI: | Common Law Breach of Implied Contract |
| Count VII: | Common Law Misappropriation of Idea/Trade Secret |
| Count VIII: | Common Law Quantum Meruit |

FMNA responded to Keane's Second Amended Complaint with its Third Motion to Dismiss Pursuant to Federal Rule 12(b)(6) with accompanying Brief in Support .(Docket Entry Nos. 42 and 43). On November 24, 2003, Keane filed a Response to Defendants' Third Motion to Dismiss Pursuant to Federal Rule 12(b)(6) and Memorandum in Support (Docket Entry Nos. 44 and 45) after which FMNA asked for and obtained leave to file a Reply to Plaintiff's Response to their Third Motion to Dismiss Pursuant to Federal Rule 12(b)(6) (Docket Entry Nos. 46, 47, and 48).

### III. *FMNA Defendants' Third Motion to Dismiss*

#### A. Defendants' Arguments

FMNA asks the court to dismiss this action because Keane has failed to state a claim for which relief can be granted.

FMNA argues that Keane's trademark and unfair competition claims fail because his alleged use of the phrase "American Idol" in commerce falls short of establishing the actual use necessary to state a trademark infringement claim under either federal or Texas law.[50] FMNA contends that "use in commerce" is an element of the definition of any mark under the Lanham Act, whether or not it is registered.[51]

FMNA further contends that Keane's "admitted lack of actual use belies his allegation that he created 'extensive goodwill' and public recognition in 'American Idol,'" thereby derailing his unfair competition claims. FMNA also argues that Keane's unfair competition claim fails because unfair competition claims do not apply to the uncredited author of an idea, concept, or communication embodied in a product.[52]

FMNA argues that Keane's breach of implied contract claim fails for several reasons. First, Keane alleges that he mailed an unsolicited "descriptive sales packet" to Pearson in England, but he does not establish the basis for any contractual obligation to him that proceeded or resulted from that action.[53] Second, even if an implied contract was formed, it was formed with Pearson, which is not a defendant in this action.[54] Third, Keane erroneously contends that Pearson and FremantleMedia of North America, Inc. are the same company, and, even if true, this allegation does not establish privity between Keane and the other defendants.[55] Fourth, without the ability to establish privity, the claim against the other defendants would amount to a copyright infringement claim and would thus be preempted by the

---

50. Brief in Support of FMNA Defendants' Third Motion to Dismiss, Docket Entry No. 43 at ¶ 10.

51. FMNA Defendants' Reply, Docket Entry No. 47 at ¶ 3, n. 3.

52. Brief in Support of FMNA Defendants' Third Motion to Dismiss, Docket Entry No. 43 at ¶ 10, relying on *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003).

53. *Id.* at ¶ 11.

54. *Id.*

55. *Id.*

Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.* (the "Copyright Act").[56]

Finally, FMNA argues that Keane's claims of misappropriation of a trade secret and quantum meruit are also preempted by the Copyright Act because Keane's allegation that he submitted his idea to Pearson in "confidence" is belied by his allegation that the "secret" was mass-mailed.[57] Furthermore, Keane has not alleged that he ever sent his sales packet to defendants Fox Television Stations, Inc. and Simon Cowell.[58]

### B. Keane's Response

Keane argues that it is incongruous for FMNA to argue both that Keane's "American Idol" idea/mark was not used in commerce and that Keane's alleged mass-mailing of his "American Idol" idea/mark negates his claims of implied contract and misappropriation of idea.[59] He insists that his mass-mailing demonstrates that his idea/mark was used in commerce.[60] Furthermore, Keane asserts that FMNA has not cited any case law for the proposition that "use in commerce" is a prima facie element of claims for federal and state trademark infringement, false designation of origin, unfair competition, and reverse passing off.[61] Keane also contends that *Dastar,* a recent Supreme Court case upon which FMNA relies, is inapposite to this action.[62]

Keane argues that his implied contract and misappropriation of idea claims are supported by the contents of his "descriptive sales packet" and by industry custom.[63] Keane asserts that none of his claims, including his claim for quantum meruit, are preempted by the Copyright Act because his Second Amended Complaint "sets forth claims for his American Idol idea and AMERICAN IDOL mark, not the 'expression' of an idea." [64]

### IV. *Analysis*

### A. The Facts Alleged

Keane attached to his Second Amended Complaint (and to his Memorandum in Support of his Response to the defendants' pending motion) several exhibits, including a copy of what he deems a "descriptive sales packet." He relies heavily on that document's alleged dissemination in 1998 to defend against FMNA's Motion to Dismiss. Federal Rule of Civil Procedure 10(c) states that "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." FED. R. CIV. P. 10(c). An allegation in a complaint may be contradicted and "controlled by" documents referred to in the complaint. *Nishimatsu,* 515 F.2d at 1206. The court has therefore examined the contents of Keane's "descriptive sales packet" and compared it to the conclusory statements alleged in Keane's Second Amended Complaint.

Having studied Keane's Second Amended Complaint and the exhibits that he in-

---

56. *Id.*

57. *Id.* at ¶ 12.

58. *Id.* at ¶ 13. The court notes that Keane has also not alleged that he sent his "descriptive sales packet," or any other material, to the four unserved defendants.

59. Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 4.

60. *Id.*

61. *Id.*

62. *Id.* at ¶ 4.

63. *Id.* at ¶ 5.

64. *Id.*

corporated by reference, for the purpose of considering FMNA's Motion to Dismiss, the court must accept that the following allegations are true: (1) Keane sent the document that he identifies as a "descriptive sales packet" to production companies, including Pearson; (2) that packet contained information about an idea for a talent show that Keane was hoping to produce and that he considered calling "American Idol;" (3) Pearson is now FremantleMedia NA; (4) FremantleMedia NA produced a television show called *Pop Idol* that is similar to Keane's unproduced "American Idol" idea; and (5) FremantleMedia NA licensed the "Pop Idol" concept to Fox, which in turn produced the television show *American Idol.*

The actual content of Keane's alleged "descriptive sales packet" differs, however, from the manner in which the document is characterized in Keane's Second Amended Complaint (Docket Entry No. 38) and in his Memorandum in Support of his Response to FMNA's Third Motion to Dismiss (Docket Entry No. 45). For example, Keane describes the document as a packet prepared for "prospective financial investors, business associates and production companies to promote, market and/or generate sponsors necessary to fund the development of his American Idol." [65] Yet, the letter's salutation—"Dear Business Owners"—and its opening paragraph imply that it is a follow-up letter being sent to business owners in Marshalltown, Iowa, to whom Keane had previously sent a letter, not an introductory sales letter addressed to international production companies:

Dear Business Owners:

I recently sent out a letter announcing plans for a family music theatre for the community of Marshalltown. I have received numerous phone calls asking me who we are and what I have planned. I have decided to **write you again telling you about myself and my plans for my family theatre.** [66]

Nothing about the substance of this letter, which lacks any return address, telephone number, or other contact information, suggests that it embodies an attempt to sell an idea to production companies. Instead, it appears to be an effort to get "sponsorship" from "business owners" for Keane's company so that Keane could produce "family musical theatre" in Marshalltown, Iowa. [67] The letter does not mention a "sales packet" or allude to any enclosures. It is difficult to square Keane's allegation that he sent this material to international production companies as an attempt to market his "American Idol" idea with the actual content of the letter, which seeks "sponsorship" for the "Marshalltown Music Theatre and American Idol." Seeking "sponsorship" for one's own production and seeking to sell an idea so that others might turn it into a production are two distinct activities. The distinctions between those two activities are critical to assessing the legal viability of Keane's claims.

Because Keane opted to attach exhibits that undermine and contradict his own allegations, he has essentially been "hoist with his own petard." WILLIAM SHAKESPEARE, HAMLET III.4.207.[68] "[I]f a plaintiff

---

**65.** Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss Pursuant to Federal Rule 12(b)(6), Docket Entry No. 45 at ¶ 10.

**66.** Second Amended Complaint, Docket Entry No. 38, Exhibit G, cover letter (emphasis added).

**67.** *Id.*

**68.** That is, he has been blown up by his own bomb.

chooses to 'plead particulars, and they show he has no claim, then he is out of luck—he has pleaded himself out of court.'" *Jefferson v. Ambroz,* 90 F.3d 1291, 1296 (7th Cir.1996) (*quoting Thomas v. Farley,* 31 F.3d 557, 558–59 (7th Cir. 1994)). Based on the materials that Keane has attached to both his Second Amended Complaint and to his Memorandum in Support of his Response to FMNA's Third Motion to Dismiss, the court must also accept as true for the purposes of FMNA's Motion to Dismiss only that the letter that Keane mailed in May of 1998 sought sponsors for his "family theatre" in Marshalltown, Iowa, through which he planned to produce a "live talent show" to be called "American Idol" based on an idea that he had developed some time after he had produced his 1997 stage musical "Elvis, Then, Now & Forever."

Although the cover letter in Exhibit G states that Keane "wrote" an "American Idol" show in 1994,[69] Keane no longer claims that he wrote and then copyrighted the expression of an idea in a work called "American Idol," but only that over time he developed an idea that he called "American Idol" and that as early as May of 1998 he used the "American Idol" mark in commerce.[70] The court also accepts as true Keane's allegations that some time after May 1998 he "advertised" his "American Idol" idea on the Internet and spoke to at least three people about his idea: his uncle Manuel Gerado, his father-in-law David O'Donnell, and the student Daniel Schomaker.

█ Having construed Keane's Second Amended Complaint in light of the attached exhibits, the court must next consider the factual fit between these factual allegations and the claims in his Second Amended Complaint. Dismissal of a claim is appropriate if it lacks an allegation regarding an element required to obtain relief. *Blackburn,* 42 F.3d at 931.

## B. The Claims Asserted

█ This action is derailed by two fundamental, fallacious premises. First, Keane presupposes that his "American Idol" concept or idea can be protected by trademark law. However, trademarks are devices intended to identify fully developed products and services, not ideas for products or services. *See Sport Supply Group, Inc. v. Columbia Casualty Co.,* 335 F.3d 453, 460–61 (5th Cir.2003) (noting that "the primary function of a trademark is to serve as a label—a mark that identifies and distinguishes a particular product"). Having retreated from his initial effort to assert a copyright infringement claim, but relying on the same facts that allegedly gave rise to that claim, Keane has recast his claims in the guise of trademark law. Yet, an idea for a television show is neither a product nor a service within the purview of trademark law. See discussion below of *Dastar Corp. v. Twentieth Century Fox Film Corp.,* 539 U.S. 23, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003).

Although an idea cannot be trademarked, the phrase "American Idol" could in principle be a trademark. A trademark includes "any word, name, symbol, or device, or any combination thereof" utilized to distinguish goods or products from those manufactured or sold by others and to identify the source of a particular good

---

**69.** "A live talent competition that I wrote in 1994.[sic] The show entitled 'American Idol' search for a superstar will bring live entertainment to the Metroplex for years to come." *Id.,* Exhibit G.

**70.** See Second Amended Complaint, Docket Entry No. 38 at ¶¶ 54–55.

or service. 15 U.S.C. § 1127 (2003). Therefore, in analyzing the viability of Keane's trademark infringement claims, while accepting all of his non-contradictory allegations as true, the court can only assess whether Keane has alleged a set of facts to support a claim for infringement upon his "American Idol" mark, not for theft of an idea for a product to be called "American Idol."

■ The second erroneous premise is Keane's allegation that being the first in time to use the "American Idol" mark in relation to some kind of commercial activity is sufficient to give him exclusive rights to use the "American Idol" mark. "Mere invention, creation, or discussion of a trademark does not create priority rights." *Hydro–Dynamics, Inc. v. George Putnam & Co., Inc.*, 811 F.2d 1470, 1473 (Fed.Cir. 1987) (citations omitted). The court's analysis therefore focuses on whether Keane has alleged facts that, if true, would show that he owns the "American Idol" mark.

> 1. *Counts I, III, V: False Designation of Origin under the Lanham Act, 15 U.S.C. § 1125(a)*

Despite their characterization as three distinct causes of action, Counts I, III, and V in Keane's Second Amended Complaint are the same claim. Keane does not allege that he is the owner of a federally registered mark upon which the defendants have infringed. Therefore, the section of the Lanham Act upon which he could ostensibly rely is section 1125(a), which empowers unregistered owners of marks to bring a civil action against those

> who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name,

symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-

> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities[.]

15 U.S.C. § 1125(a)(1) (2003).

Section 1125 of the Lanham Act creates two distinct bases for liability: "(1) false representation in advertising concerning the qualities of goods (false advertising claims); and (2) false representations concerning the origin or endorsement of goods (false association or product infringement claims)." *Hutchinson v. Pfeil,* 211 F.3d 515, 520 (10th Cir.2000). Keane has not alleged that he is seeking recovery for "false advertising" concerning the quality of any "goods." Instead, Keane alleges that the defendants infringed on his mark/idea by attempting to pass Keane's "American Idol" mark/idea off as their own, an activity deemed "reverse passing off."[71] *Dastar,* 539 U.S. at —— n. 1, 123 S.Ct. at 2045 n. 1. Thus, the three causes of action that Keane characterizes as "Federal Trademark Infringement,"[72] "False Designation of Origin and Unfair Competition,"[73] and "Reverse Passing Off/Reverse

---

71. See *id.* at ¶¶ 53–113.

72. *Id.* at p. 12.

73. *Id.* at p. 15.

Confusion" [74] are all attempts to rely on the Lanham Act's prohibition against false designations of origin when selling goods or services in commerce. *See Roho, Inc. v. Marquis,* 902 F.2d 356, 359 (5th Cir.1990) (explaining that the Lanham Act's prohibition of false description or false designation of origin covers the following activities: false advertising of goods or services, "palming off" one's goods under the name of a competitor, and reverse palming off, which is the misappropriation of the services or goods of another).

■ In its recent analysis of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1), the Supreme Court emphasized that the phrase "origin of goods" in the statute's text does not connote "the person or entity that originated the ideas or communications" that the resulting commercial product embodies or contains. *Dastar,* 539 U.S. at ——, 123 S.Ct. at 2047. Instead, section 43(a) is intended to protect against consumer confusion and a producer's loss of good will by creating a means to sue parties who endeavor to exploit the name-recognition that a pre-existing producer has created in the marketplace. *Id.* As the Court noted, consumers do not assume or care whether the idea for a branded product originated with company "X," which is why the Lanham Act does not protect the source of content per se; if it did, it would "conflict with the law of copyright, which addresses that subject specifically." *Id.* at 2048. Federal trade-mark law is not concerned with "invention or discovery" of ideas,[75] and the Court explicitly cautions against extending trademark law in that manner. *Id.* (*quoting In re Trade–Mark Cases,* 100 U.S. 82, 94, 25 L.Ed. 550 (1879)). In other words, the Lanham Act does not create a cause of action for "plagiarism," that is, "the use of otherwise unprotected works and inventions without attribution." *Id.* at 2049.

■ Liability under section 1125(a) hinges on the likelihood of confusion in the marketplace regarding the source of a particular good or service. *Sport Supply Group,* 335 F.3d at 460. However, for a court to consider the "likelihood of confusion," a plaintiff must plead facts demonstrating that, through its use in commerce, the plaintiff had won the race to the marketplace such that it owns the exclusive right to use a particular mark. *Lucent Information Management, Inc. v. Lucent Technologies, Inc.,* 186 F.3d 311, 315 (3d Cir.1999), *cert. denied,* 528 U.S. 1106, 120 S.Ct. 845, 145 L.Ed.2d 714 (2000); *Zazu Designs v. L'Oreal, S.A.,* 979 F.2d 499, 503 (7th Cir.1992); *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *Blue Bell, Inc. v. Farah Mfg. Co., Inc.,* 508 F.2d 1260, 1266 (5th Cir. 1975); *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 929 (8th Cir.1967); *Rolley, Inc. v. Younghusband,* 204 F.2d 209, 212 (9th Cir. 1953).

---

74. *Id.* at p. 17.

75. Even the law of copyright does not protect ideas per se. A work is only copyrightable if it is (1) the author's original work that is (2) fixed in any tangible medium of expression. 17 U.S.C. § 102(a) (2003). Copyright protection does not, for instance, extend "to any idea, procedure, process, system, method of operation, concept, principle or discovery...." *Id.* § 102(b). Words and short phrases, names, titles, slogans, facts, informa-tion in the public domain, and field-specific jargon are also not amenable to copyright. *Engineering Dynamics, Inc. v. Structural Software, Inc.,* 26 F.3d 1335, 1344 (5th Cir.1994). Keane acknowledges that copyright law does not protect ideas but only the expression of ideas. See Plaintiff's Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 29. However, he ignores the fact that trademark law does not protect ideas either.

■ Winning the race to the marketplace is not accomplished by being the first in time to use a mark, but requires both appropriation of the mark and use of the mark in trade. *United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); 2 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 16:11 (4th ed. 1997) ("The mere fact that a party conceived the idea of a trademark and discussed it with others does not establish priority as of the date of those events."). One must have done far more than use the mark in discussions, solicitations, shipments, or even in some sales. *See, e.g., Zazu*, 979 F.2d at 503 (holding that items bearing an unregistered mark, which were sold in one store and also distributed to the producer's friends, did not constitute use in commerce sufficient to obtain rights in a mark). Preparing to sell goods or services under a particular label, shipping marked merchandise to stores, making sales to intra-corporate personnel, and even "actively soliciting accounts" has been deemed inadequate to satisfy the requisite "use in commerce" necessary to acquire trademark rights. *See Blue Bell*, 508 F.2d at 1265–66. The use must have been sufficiently public to have "allow[ed] consumers to associate a mark with particular goods" and to have "notifie[d] other firms that the mark is so associated." *Zazu*, 979 F.2d at 503. Therefore, a plaintiff can prevail only by showing prior use of the mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Blue Bell*, 508 F.2d at 1266.

■ Keane's allegations that are not controverted elsewhere in his own pleadings show that he consistently alleges having used the "American Idol" mark since at least May 8, 1998.[76] However, the "use" to which he refers is his "set[ting] out to market/promote the production of" his "American Idol" idea.[77] This promotion and marketing was allegedly accomplished through the following activities: (1) he sent out a "descriptive sales packet" in which he described his idea for an "American Idol" talent show and sought "sponsorship" from "business owners" so that he might produce the show in Marshalltown, Iowa; (2) he sought buyers for his "American Idol" idea by posting advertisements on the Internet; and (3) he discussed his idea with at least one potential "investor," Daniel Schomaker, who gave Keane money, not for Keane's "American Idol" idea, but as an investment in Keane's company, which Keane hoped would at some point produce a show called "American Idol" in Marshalltown.

Keane claims that he is the senior user of the "American Idol" mark, that the defendants usurped his position, and that the defendants Cowell and Fuller falsely claim that they are the creators of *American Idol*.[78] Keane characterizes these activities as deception of the public as to the "origins" of the "American Idol" idea and mark.[79] Keane also claims that before the defendants endeavored to pass the "American Idol" idea off as their own, the "American Idol" mark "ha[d] become so associated in the mind of the public that the public identifies" the mark with him.[80]

**76.** Second Amended Complaint, Docket Entry No. 38 at ¶ 54.

**77.** Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 10.

**78.** Second Amended Complaint, Docket Entry No. 38 at ¶¶ 84–86.

**79.** *Id.* at ¶ 49.

**80.** Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 17, citing

Keane then identifies "the public" as a few individuals, including his uncle and father-in-law, with whom he allegedly discussed his "American Idol" concept. Finally, Keane alleges that these individuals became confused when they saw Fox's *American Idol* on television because they believed that the "American Idol" mark/idea belonged to Keane.[81] Keane does not allege that members of the general public saw his "American Idol" mark, came to associate that mark with him, and then became confused upon seeing Fox's *American Idol*, thinking that *American Idol* had originated with Keane. Nor could the factual narrative presented in his Second Amended Complaint logically support such a claim because he admits that he has never produced a product bearing the mark "American Idol."[82] Just as a "product" is distinct from an "idea for a product," an attempt to sell an idea to potential investors is not analogous to the sale of a trademarked good or service to the public at large.

Keane's admissions that he was unsuccessful at selling a product under the "American Idol" mark alone amounts to a failure to plead the threshold requirement of a Lanham Act cause of action because mere expectation or hope that a mark will be used, i.e., attempts at "promotion and marketing" of an idea under a "mark," is insufficient to establish exclusive rights in a mark. *See Lucent*, 186 F.3d at 318, and *Zazu*, 979 F.2d at 503 (both relying on *Blue Bell*, 508 F.2d 1260, for the proposition that meaningful and public commercial use is required to establish rights in an unregistered mark). The relevant case law demonstrates that Keane's claims fail as a matter of law even if he had used the mark to endeavor to sell an actual product

or service rather than an idea. Furthermore, that which Keane claims to have been promoting was not a "product" as cognized by trademark law, but merely an unprotectable idea. *Sport Supply Group*, 335 F.3d at 460–61.

Even assuming that Keane did engage in all of the activity regarding his "American Idol" mark that his Second Amended Complaint describes, and even discounting the fact that his own exhibits contradict and undermine several critical aspects of the narrative he paints in the body of his Second Amended Complaint and in his Memorandum in Support of his Response, Keane has not alleged the factual predicate for a Lanham Act false designation of origin/reverse passing off claim. Counts I, III, and V of Keane's Second Amended Complaint will, therefore, be dismissed.

### 2. *Count II: Common Law Trademark Infringement*

■ The test for ascertaining the likelihood of confusion applicable in false designation of origin claims and the prerequisite requirement of establishing one's rights in a mark through use in commerce, discussed above, are equally applicable to common law trademark infringement. *Sport Supply Group*, 335 F.3d at 461. In fact, "[t]he issues in a common law trademark infringement action under Texas law are no different than those under federal trademark law." *Id.* (*quoting All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 488 (Tex.App.—Fort Worth 1999, n.w.h.)). Count II of Keane's Second Amended Complaint will therefore be dismissed.

---

Second Amended Complaint at ¶¶ 18–19, 23–25, 31–33.

**81.** *Id.*

**82.** Second Amended Complaint, Docket Entry No. 38 at ¶ 34.

3. *Counts IV and VII: Common Law Unfair Competition and Common Law Misappropriation of Idea/ Trade Secret*

 Under Texas law "unfair competition" is a general rubric under which fall all statutory and non-statutory causes of action arising out of dishonesty in industrial or commercial matters. *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 14 (5th Cir.1974). To prevail, the plaintiff must show that the defendant committed an illegal act that interfered with the plaintiff's ability to conduct its business; the illegal act need not necessarily violate criminal law, but must at least be an independent tort. *Taylor Publishing Co. v. Jostens, Inc.,* 216 F.3d 465, 486 (5th Cir.2000) (*citing Schoellkopf v. Pledger,* 778 S.W.2d 897, 904–05 (Tex.App.— Dallas 1989, writ denied) (*stating* that "Without some finding of an independent substantive tort or other illegal conduct, we hold that liability cannot be premised on the tort of 'unfair competition.' ")).

The independently tortious act Keane alleges is that the defendants misappropriated his novel idea, which was a trade secret.[83] Therefore, Count VII, Keane's Misappropriation of Idea/Trade Secret claim, is the cause of action whose elements the court must consider in determining whether Keane has alleged facts to support a claim of unfair competition. However, the way in which Keane has pleaded his misappropriation cause of action is confusing because it combines features and relies on case law involving three distinct causes of action: misappropriation of a product, misappropriation of a trade secret, and misappropriation of an idea. The first two have been explicitly recognized under Texas law; the latter has

not. For the purposes of the present analysis the court will assume that all three causes of action are available under Texas law.

a. Misappropriation of a Product

 The tort of misappropriation of a product "involves the appropriation and use by the defendant, in competition with the plaintiff, of a unique pecuniary interest created by the plaintiff through the expenditure of labor, skill, and money. [citations omitted] It is recognized under Texas law." *U.S. Sporting Products, Inc. v. Johnny Stewart Game Calls, Inc.,* 865 S.W.2d 214, 217 (Tex.App.—Waco 1993, writ denied) (*quoting Universal City Studios v. Kamar Industries,* 217 U.S.P.Q. 1162 (S.D.Tex.1982) (approved in *Conan Properties, Inc. v. Conans Pizza, Inc.,* 752 F.2d 145, 156 (5th Cir.1985))). The elements of this cause of action are: (1) the plaintiff created a product after expending extensive time, labor, skill, and money; (2) the defendant used that product in competition with the plaintiff, thereby gaining a special advantage in that competition (*i.e.,* a "free ride") because defendant is burdened with little or none of the expense incurred by the plaintiff; and (3) the plaintiff was commercially damaged as a result. *U.S. Sporting Products,* 865 S.W.2d at 218.

b. Misappropriation of a Trade Secret

 A trade secret is "any formula, pattern, device or compilation of information which is used in one's business and presents an opportunity to obtain an advantage over competitors who do not know or use it." *Computer Associates Int'l. Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455 (Tex. 1996). One who either discloses or uses another's trade secret, without a privilege

**83.** See *id.* at ¶¶ 98–107. Trademark infringement could also provide an independent basis for an unfair competition claim. However, as discussed above, Keane has not alleged the factual predicate for a Lanham Act or common law trademark infringement claim.

to do so, can be liable for such disclosure or use if the disclosure or use constitutes a breach of confidence reposed in the party disclosing or using the trade secret. *IBP, Inc. v. Klumpe,* 101 S.W.3d 461, 472 (Tex. App.—Amarillo 2001, writ denied) (*citing Hyde Corp. v. Huffines,* 158 Tex. 566, 314 S.W.2d 763, 769–70 (1958)).

■■■ To establish that his "American Idol" idea is entitled to trade secret protection, Keane would have to satisfy the Restatement's six-factor test, which requires the court to evaluate: (1) the extent to which the information is known outside of his business, (2) the extent to which it is known by employees and others involved in his business, (3) the extent of the measures he took to guard the secrecy of the information, (4) the value of the information to him and his competitors, (5) the amount of effort or money he expended in developing the information, and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. *Chapa v. Garcia,* 848 S.W.2d 667, 670 (Tex.1992) (Doggett, J., concurring) (internal quotations omitted) (*quoting* RESTATEMENT OF TORTS § 757 cmt. b (1939)).

#### c. Misappropriation of an Idea

■■■ In *Official Airlines Schedule Information Services, Inc. v. Eastern Air Lines, Inc.* ("*OASIS*"), 333 F.2d 672, 673 (5th Cir.1964), the Fifth Circuit delineated the elements a plaintiff must satisfy before liability for misappropriation of an idea may be imposed. These elements are: (1) the idea was novel; (2) the disclosure of the idea was made in confidence; and (3) the idea was adopted and used by the defendant. *Id.* The law described in *OASIS* is not Texas law. Keane's pleadings do not contain a choice of law argument;

in fact, he relies on case law involving the law of multiple jurisdictions. However, assuming that the law discussed in *OASIS* is applicable, the court concludes that the pivotal element of the misappropriation of idea cause of action for the purposes of evaluating the defendants' 12(b)(6) motion is the confidentiality element, for the other two elements would be matters of fact for the jury.

#### d. Keane's Misappropriation Cause of Action

■■■ Keane does not allege that he produced a "product" as courts considering the viability of the misappropriation of a product tort have construed that term. *See U.S. Sporting Products,* 865 S.W.2d 214 (involving the misappropriation of one company's animal sound recordings); *Synercom Technology, Inc. v. University Computing Co.,* 474 F.Supp. 37 (N.D.Tex. 1979) (holding that the alleged misappropriation of input formats, instruction manuals, and related services was preempted because the claim involved the misappropriation of ideas not products); *Universal City Studios,* 217 U.S.P.Q. 1162 (involving the misappropriation of licensing and merchandising rights arising from the production of the film *E.T. The Extra–Terrestrial* ). Instead, Keane claims that he had an idea for a product that he tried, unsuccessfully, to market and that the defendants misappropriated that idea.[84] Therefore, the court need only consider whether Keane has alleged facts sufficient to sustain either a misappropriation of a trade secret or a misappropriation of an idea cause of action.

The critical threshold requirement for pursuing either of these two misappropriation causes of action is secrecy/confidentiality. "If an individual discloses his trade secret to others who are under no

---

**84.** Second Amended Complaint, Docket Entry No. 38 at ¶ 34.

obligation to protect the confidentiality of the information ... his property right is extinguished." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

Keane claims that his "American Idol" concept was a trade secret or an original idea of the type that the law protects.[85] However, he also claims that he gratuitously published his idea in the following ways: (1) mailing a "descriptive sales packet" to various production companies whose names and addresses he got out of a trade magazine, (2) advertising his idea on the Internet, and (3) discussing the idea with potential investors and family members intermittently over the course of several years.[86] Keane claims that Pearson was among the companies to which Keane sent information about his "American Idol" concept.[87] He also alleges that Pearson and others "solicited" his idea because they placed advertisements in *Variety* magazine.[88] Keane further claims that his use of the words "sponsorship" and "long lasting relationship" in the "descriptive sales packet" that he allegedly sent to Pearson and others established a confidential relationship.[89] Alternatively, Keane argues that "at the very least" industry custom implies confidentiality when production companies advertise for ideas and then receive submissions such as the one that Keane alleges he sent to Pearson.[90]

In the 12(b)(6) context the court would ordinarily presume the truth of Keane's assertion regarding industry custom. However, the court is "not required to accept as true conclusory allegations [that] are contradicted by documents referred to in the complaint." *Warren*, 328 F.3d at 1139. Keane attached the *Variety* advertisement[91] to which he claims he responded by sending his material to a "select group." [92] Even a superficial assessment of the advertisements in Keane's Exhibit H reveals that they are clearly not a call for ideas, as Keane claims; instead, they advertise the companies' own new (and completed) products.[93]

■ Keane does not allege that he and Pearson had any prior dealings or an explicit agreement before or after Keane allegedly mailed his "descriptive sales packet." By gratuitously sending a packet of information to a company, hoping that the company might contribute financially to Keane's desire to turn an idea into a production of some kind, Keane extinguished any property right to a trade secret that he might have had. Keane had no ability to create a confidential relationship between him and the production companies to whom he allegedly sent his idea simply by declaring that it was self-evident that he was hoping to be paid for its use.[94] The

---

85. *Id.* at ¶ 101.

86. *Id.* at ¶¶ 18–34.

87. *Id.* at ¶ 28.

88. *Id.* at ¶ 29.

89. Plaintiff's Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 45.

90. Second Amended Complaint, Docket Entry No. 38 at ¶ 102.

91. "A true and correct copy of page M62 from the Variety [sic] magazine Keane used is

attached to this Complaint as Exhibit H." *Id.* at ¶ 28, n. 8.

92. *Id.* at ¶ 101.

93. See *id.*, Exhibit H.

94. Keane asserts that he "did not need to specifically state that the condition of his offer [to sell his "American Idol" idea] was that the recipient(s) [of his "descriptive sales packet"] assume an obligation to pay because that was clearly implied by the words 'sponsorship' and 'long lasting business relationship' against the backdrop of the custom and prac-

Fifth Circuit, in a case upon which Keane seeks to rely, explicitly addressed the issue of "whether one person, by his gratuitous and unilateral act, may impose upon another a confidential relationship" and has categorically stated that a person may not do so. *OASIS*, 333 F.2d at 674. Absent the element of a confidential relationship, misappropriation claims are preempted by copyright law.[95] 1 M. & D. NIMMER, NIMMER ON COPYRIGHT § 1.01[B][1][H] (2003); *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 850 (2d Cir.1997).

■ Furthermore, Keane's additional factual assertion that he advertised his "American Idol" concept on the Internet entirely eviscerates his ability to characterize that concept as a trade secret or as an idea that was conveyed in confidence to a select group.[96]

Because Keane's own allegations show that he did not possess a trade secret or convey a protected idea in confidence, Keane's general claim of unfair competition based on the specific allegation of misappropriation of idea/trade secret, Counts IV and VII in his Second Amended Complaint, will de dismissed.

### 4. *Count VI: Common Law Breach of Implied Contract*

■ An implied-in-fact contract is one whose existence and terms arise from conduct rather than words. *Preston Farm & Ranch Supply, Inc. v. Bio–Zyme Enterprises*, 625 S.W.2d 295, 298 (Tex.1981). For the submission of an idea to give rise to an implied contract, two circumstances must have existed when the idea was disclosed: (1) the "idea purveyor" must have "clearly conditioned his offer to convey the idea upon an obligation to pay" for the use of that idea *before* it was disclosed, and (2) the offeree must have agreed to have the idea disclosed knowing of this condition. *Kleck v. Bausch & Lomb, Inc.*, 145 F.Supp.2d 819, 824 (W.D.Tex.2000) (*citing Desny v. Wilder*, 46 Cal.2d 715, 299 P.2d 257, 270 (1956)).

Keane makes conclusory claims that an implied contract arose when he conveyed his "American Idol" idea to Pearson in a massmailed letter that he claims shows that he expected to be compensated for any use of that idea.[97] He further asserts that by producing the *American Idol* television show in the United States, the de-

---

tices in the [film and television] industry." Plaintiff's Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 37. However, his claim that he was trying to sell an idea, critical to this misappropriation claim, is belied by the text of his own "descriptive sales packet," which does not offer any idea for sale, but rather seeks "sponsorship" for a "Music Theatre" company he was trying to establish in Marshalltown, Iowa. See Second Amended Complaint, Docket Entry No. 38, Exhibit G.

**95.** Keane also cites language in *Capital Films Corp. v. Charles Fries Productions, Inc.*, 628 F.2d 387, 395 (5th Cir.1980) to argue that a "confidential relationship" could have existed between him and Pearson even though his idea was published. In *Capital Films* the court held that "under certain circumstances,

the practice of screening movies [to agents and potential film distributors] can support a jury's finding of 'confidential relationship'" necessary to prevail on a misappropriation of idea claim. *Id.* at 395. However, the factual predicate of that case does not parallel this one. The plaintiff in *Capital Films* had actually produced and distributed a film; the defendant subsequently endeavored to produce a television movie based on the same idea and using the same title. *Capital Films* does not stand for the broad proposition that any mass publication of a bare idea to members of the entertainment industry can create a confidential relationship.

**96.** See Second Amended Complaint, Docket Entry No. 38 at ¶ 30.

**97.** *Id.* at ¶¶ 28, 91.

fendant "impliedly agree[d] and promis[ed] to pay Keane for their use of Keane's American Idol." [98] Finally, Keane argues that his breach of implied contract claim is legitimately raised against the other defendants (i.e., those other than FremantleMedia NA, which Keane claims is Pearson's precursor) because when he advertised his "American Idol" idea on the Internet "the same potential to form an implied contract arose with recipients as mailing the descriptive sales packet." [99]

The court is not persuaded by Keane's arguments. Neither the act of mass-mailing a "sales packet" to a stranger, wherein an idea is described, nor the act of advertising an unprotected idea for sale on the Internet is an act likely to create an implied contract between the idea man and those who read of his idea as a result. Furthermore, the letter to which Keane points to buttress his allegations [100] neither offers an idea for sale nor conditions the disclosure of an idea on a promise that he be paid should the letter's recipient opt to use his idea at some point in the future. Keane's letter shows that he was merely seeking sponsors for his own undertaking, not buyers for his idea. "A submission [of any idea] made for the purpose of interesting the recipient in participating in the enterprise as a partner or joint venturer will not give rise to an implied-in-fact contract because there is no evidence of an expectation of compensation for the service of revealing the idea." *Kleck*, 145 F.Supp.2d 819, 825 (W.D.Tex. 2000) (*citing Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902–03 (9th Cir.1987), and holding that "no contract may be implied where an idea has been disclosed not to gain compensation for that idea but for the sole purpose of inducing the defendant to enter a future business relationship"). Moreover, Keane's idea for an "American Idol" talent show is simply blurted out in the letter that he attaches to his Second Amended Complaint. The "idea man who blurts out his idea without having first made his bargain"—whether in a so-called sales packet, Internet postings, or discussions with family members and callow undergraduate students—"has no one but himself to blame for the loss of his bargaining power." *Kleck*, 145 F.Supp.2d at 824 (*quoting Desny*, 299 P.2d at 270). Disclosure cannot accompany a condition that is a prerequisite of disclosure. *Id.* at 825.

Keane makes no allegations suggesting that he and any of the defendants had a meeting of the minds such that a contract among them could be implied. *See Fraud–Tech Inc. v. Choicepoint, Inc.*, 102 S.W.3d 366, 385–86 (Tex.App.—Fort Worth 2003, reh'g overruled, writ denied) (*quoting Ishin Speed Sport, Inc. v. Rutherford*, 933 S.W.2d 343, 348 (Tex.App.—Fort Worth 1996, no writ)). In *Fraud–Tech*, where the court found that a fact issue existed as to whether an agreement between the parties was an implied-in-fact contract, the parties had prior dealings, including a mutual nondisclosure agreement to protect against the dissemination of their confidential information, they had signed a letter of intent, and they had started to perform under a written contract before it was formally executed. *Id.* at 371. Keane has alleged no analogous facts. Indeed, the documents that Keane has incorporated by reference into his Second Amended Complaint undercut any suggestion that he conveyed an idea to any

---

**98.** *Id.* at ¶ 93.

**99.** Plaintiff's Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 40.

**100.** See Second Amended Complaint, Docket Entry No. 38, Exhibit G.

defendant on the condition that, if used, he be paid for it. Therefore, Keane's breach of implied contract claim, Count VI in his Second Amended Complaint, will be dismissed.

### 5. *Count VIII: Common Law Quantum Meruit*

 Quantum meruit is an equitable theory of recovery based on an implied agreement to pay for benefits received. *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex. 1990). To recover under the doctrine of quantum meruit a plaintiff must establish that (1) valuable services and/or materials were furnished (2) to the party sought to be charged (3) that were accepted by the party sought to be charged and (4) under such circumstances that reasonably notified the recipient that the plaintiff, in performing, expected to be paid by the recipient. *Heldenfels Brothers, Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992).

Keane alleges that he rendered a valuable service by creating his "descriptive sales packet" and submitting it to the defendants.[101] He further alleges that the defendants accepted his "descriptive sales packet."[102] Keane then argues that his expectation that he be paid for the use of his idea was in and of itself a circumstance sufficient to reasonably notify defendants that he expected to be paid for its use.[103] Therefore, he claims to be entitled to reimbursement for services rendered "in developing, promoting and marketing his American Idol idea and his AMERICAN IDOL mark," which is distinct from a claim for defendants' unauthorized copying and distribution of a copyrighted work.[104]

 Even assuming that producing and distributing what Keane calls a "descriptive sales packet" was a valuable service and assuming that at least one of the defendants did in fact accept this service, Keane has not alleged any facts to sustain the indispensable fourth element that this exchange of information was made under circumstances that reasonably notified the recipient that Keane, in performing the act of mailing and conveying his idea, expected to be paid by the recipient.

In *Heldenfels Bros.*, 832 S.W.2d at 42, the court concluded that no evidence had been presented that the defendant had notice that Heldenfels, a subcontractor who had supplied materials and labor as part of a construction project, anticipated payment from the defendant before Heldenfels performed. Likewise, Keane has not alleged any facts suggesting that Pearson, or any of the defendants in this action, were given reasonable notice that Keane anticipated being paid for "work" before Keane commenced performance. Keane suggests that generating the "American Idol" idea and mailing out that idea should both somehow be viewed as services rendered. Yet, Keane's Second Amended Complaint repeatedly alleges that he came up with the idea independently and disseminated the idea in hopes that someone would give him money to pursue its development. This behavior cannot rationally be characterized as a service rendered for another. Even permitting this irrational leap of faith, Keane acknowledges that in gratuitously mailing his "descriptive sales packet" and posting his idea on the Internet, he acted before defendants were on notice that he expected to be paid.

---

101. *Id.* at ¶ 109.

102. *Id.* at ¶ 110.

103. *Id.* at ¶ 111.

104. Plaintiff's Memorandum in Support of Plaintiff's Response to Defendants' Third Motion to Dismiss, Docket Entry No. 45 at ¶ 48.

Keane fundamentally misconstrues the nature of a quantum meruit theory of recovery, essentially attempting to wrest a tale of alleged plagiarism to fit the elements of a cause of action generally available to those who directly interact with another party, offer to perform work in exchange for payment, and then are not paid but merit payment despite the absence of an express agreement regarding the work performed. *See, e.g., Ingleside v. Stewart,* 554 S.W.2d 939 (Tex.Civ.App.— Corpus Christi 1977, writ ref'd n.r.e.) (holding that quantum meruit was available where subcontractor had dealt with the municipality-defendant directly in reliance on the city's apparent management of the project). Therefore, Keane's quantum meruit claim, Count VIII in his Second Amended Complaint, will be dismissed.

## C. The Relevance of Copyright Preemption to Counts II, IV, V, VI, VII, and VIII

■ FMNA argues in the alternative that because all of Keane's state law claims are vehicles through which Keane attempts to recover for the misappropriation of an idea that is within the purview of copyright law, these state law claims are preempted by federal copyright law. The court agrees.

When Congress amended the Copyright Act in 1976 it provided for the preemption of state law claims that satisfy two requirements. Under 17 U.S.C. § 301, a state law claim is preempted when (1) it seeks to vindicate "legal or equitable rights that are equivalent" to one of the bundle of exclusive rights already protected by federal copyright law (the "equivalency requirement"), and (2) the work to which the state law claim is being applied is among the types of works protected by the Copyright Act (the "subject matter requirement"). See 17 U.S.C. § 301.

Therefore, determining whether a claim is preempted by the Copyright Act is a two-step process. "First, the cause of action is examined to determine if its subject matter falls 'within the subject matter of copyright.' Second, the cause of action is examined to determine if it protects rights ... 'equivalent' to any of the exclusive rights of a federal copyright, as provided in 17 U.S.C. § 106," which gives copyright owners the exclusive right to authorize reproduction, adaptation, publication, performance, and display of their copyrighted works. *Daboub v. Gibbons,* 42 F.3d 285, 289 (5th Cir.1995).

### 1. *The Subject Matter Requirement*

Section 102(a) of the Copyright Act lists eight categories of "works of authorship" that, when "fixed in any tangible medium of expression covered by the act," are amenable to copyright protection. 17 U.S.C. § 102(a). These categories include literary, musical, and dramatic works, motion pictures, and other audiovisual works. *Id.* The factual basis of all of Keane's state law causes of action is that his "American Idol" idea for a television or stage show, a type of material within the ambit of the Copyright Act, was improperly copied. Keane's "American Idol" idea (which Keane now concedes is only an idea and not the expression of an idea) is the type of material covered by the copyright laws even though it probably would not have qualified for protection under those laws in the form he describes. *See Synercom,* 474 F.Supp. at 43. Furthermore, the fact that Keane's "American Idol" idea was not copyrightable in the skeletal form suggested by his Second Amended Complaint does not dispose of the preemption issue. *Id.*

The Copyright Act preempts states' efforts to protect items that are in principle the type of material covered by the Act even though these items would not merit

federal statutory protection because they are "too minimal or lacking in originality to qualify, or because it has fallen into the public domain." *Id.* (*quoting* H.R. No. 94–1476 at 131, *reprinted in* 1976 U.S.C.C.A.N. at 5747). More specifically, when claims involve the misappropriation of intellectual property, "section 301 preemption bars state law misappropriation claims with respect to uncopyrightable as well as copyrightable elements." *Nat'l Basketball Assoc.*, 105 F.3d at 849.

Thus, Keane's state law claims satisfy the subject matter requirement of copyright preemption.

### 2. *The Equivalency Requirement*

The core of each of Keane's state law claims is identical: the wrongful copying of an idea for a talent show to be called "American Idol." States are generally not permitted to regulate the use of ideas. *Synercom*, 474 F.Supp. at 43. Therefore, even assuming that the state law doctrines of unfair competition, misappropriation, implied contract, and/or quantum meruit would prevent the defendants from copying Keane's "American Idol" idea, the operation of those doctrines in the context presented here would be preempted.

Keane has failed to allege facts corresponding to any element, such as a breach of a fiduciary duty, that would render his claims different in kind from a copyright infringement claim. *See Daboub*, 42 F.3d at 289. The way that Keane claims to have disseminated his idea defeats his ability to circumvent federal copyright preemption because he cannot establish that his idea was conveyed in confidence as part of a commercial relationship or that

an express or implied contractual relationship existed between him and any of the defendants. Thus, Keane is merely claiming that an idea contained in his "descriptive sales packet" and/or an Internet posting was copied. Such a claim falls into the ambit of federal copyright preemption. Thus, Keane's state law claims also satisfy the equivalency requirement of copyright preemption.

Keane himself initially framed his allegations in terms of copyright infringement but amended his complaint and removed those claims after the defendants produced evidence showing that Keane had not in fact copyrighted any work that corresponded to the description of the "American Idol" that he proffered in his original complaint. Despite Keane's subsequent efforts to recharacterize uncopyrighted and uncopyrightable material as a trademark, a trade secret, a legally protected commercial idea, and a valuable service rendered, all of his state law claims, which rely on the allegation that his "American Idol" idea was stolen, are the kind of claims that are preempted by federal copyright law—even though they fail as a matter of copyright law.

### V. *Conclusion and Order*

The court has repeatedly expressed skepticism about Keane's ability to state a claim for relief based on the facts alleged.[105] Keane has been afforded two opportunities to amend after having been given notice of the deficiencies in his complaints by the court's orders and by the FMNA defendants' previous motions to dismiss. Keane has failed to correct his pleading deficiencies. Therefore, FMNA's Third Motion to Dismiss Pursuant to Federal Rule 12(b)(6) (Docket Entry No. 42) is

---

105. See Order, Docket Entry No. 4, ordering plaintiff's counsel to file an affidavit detailing the legal and factual research performed prior to filing the lawsuit, and Minute Entry Order, Docket Entry No. 37, ordering plaintiff to file an amended complaint identifying with specificity the copyrighted work that he allegedly owned and the work of the defendants that plaintiff alleges infringed upon his copyright.

GRANTED, and Plaintiff's Second Amended Complaint (Docket Entry No. 38) will be dismissed with prejudice as to the FMNA defendants: Fox Television Stations, Inc., FremantleMedia of North America, Inc., and Simon Cowell.

Because all of Keane's claims have been brought against all of the defendants based on the same set of factual allegations, and because the court has determined that Keane's allegations are insufficient to sustain any legally cognizable claim, Keane's Second Amended Complaint (Docket Entry No. 38) will also be dismissed with prejudice *sua sponte* as to the four unserved defendants: Simon Fuller, FremantleMedia, Ltd., 19 TV, Ltd., and Nigel Lythgoe. *See Malone v. Dallas City Manager's Office,* 2001 WL 910396, *2 (N.D.Tex.2001) (dismissing claims against unserved as well as served defendants based on plaintiff's failure to state a claim).

### FINAL JUDGMENT

In accordance with the court's Memorandum and Order entered this date, this action is DISMISSED with prejudice.

This is a FINAL JUDGMENT.